PEGASUS MANAGEMENT COMPANY, INC., Kahuna, Inc., as General Partner of Lahaina Realty Limited Partnership, Olympus Healthcare Group, Inc., and Daniel J. Kane, Plaintiffs,

v.

LYSSA, INC., Robko, Inc., Ginko, Inc., Amram, Inc., TRJ, Inc., Josh Manor, Inc., Michael Konig, Individually and as General Partner of HRG Realty, L.P., Scott Swamp Realty, L.P., 1312 West Main Realty, L.P., 33 Roy Street, L.P., and Bidwell Realty, L.P., Defendants.

Civil Action No. 95–12489–RCL.

United States District Court, D. Massachusetts.

Feb. 6, 1998.

---

See also ___ F.Supp. ___.

Robert P. Sherman, David R. DeVeau, Hutchins, Wheeler & Dittmar, Boston, MA, for Pegasus Management Company, Inc., Kahuna, Inc., Olympus Healthcare Group, Inc., Daniel J. Kane.

David R. DeVeau, Hutchins, Wheeler & Dittmar, Boston, MA, for Lahaina Realty Limited Partnership.

James J. Marcellino, Susan M. Insoft, Judith A. Goldberg, McDermott, Will & Emory, Boston, MA, for Lyssa, Inc., Robko, Inc., Ginko, Inc., Amram, Inc., TRJ, Inc., Josh Manor, Inc., Michael Konig, Scott Swamp Realty, L.P., 1312 West Main Realty, L.P., 33 Roy Street, L.P., Bidwell Realty, L.P.

### *MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY ON COUNT II (BREACH OF WARRANTY) (# 26)*

COLLINGS, United States Magistrate Judge.

#### *I. Introduction*

Originally filed in the Worcester County Superior Court, this civil action was removed to the federal court in November of 1995. In their four count complaint the plaintiffs, Pegasus Management Company, Inc. ("Pegasus"), Kahuna, Inc. ("Kahuna"), as general partner of Lahaina Realty Limited Partnership ("Lahaina Realty"), Olympus Healthcare Group, Inc. ("Olympus") and Daniel J. Kane ("Kane") (collectively "the plaintiffs"), have alleged claims for breach of contract, breach of warranties, misrepresentation, and violation of Massachusetts General Laws chapter 93A in connection with the purchase of a group of nursing homes located in Connecticut. The defendants, Lyssa, Inc. ("Lyssa"), Robco, Inc. ("Robco"), Ginko, Inc. ("Ginko"), Amram, Inc. ("Amram"), TRJ, Inc. ("TRJ"), Josh Manor, Inc. ("Josh Manor"), Michael Konig ("Konig"), individually and as general partner of HRG Realty, L.P. ("HRG Realty"), Scott Swamp Realty, L.P. ("Scott Swamp"), 1312 West Main Realty, L.P. ("1312 West Main Realty"), 33 Roy Street

L.P. ("33 Roy Street"), and Bidwell Realty, L.P. ("Bidwell Realty") (collectively "the defendants"), were the sellers of the properties and assets.

Following the removal to this court, the defendants duly filed their answer to the complaint together with a four count counterclaim seeking payment on a certain promissory note from the payor of the note, Lahaina Realty, as well as the guarantors of the note, Kane, Olympus, and Pegasus. The answer to the counterclaim was timely filed by the four counterclaim-defendants and, thereafter, discovery continued apace.

In June, 1997, with the parties' consent, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). The plaintiffs filed their motion for summary judgment as to liability on Count II of the complaint (# 26) on November 10, 1997; the defendants submitted their motion for summary judgment on the complaint and the counterclaim (# 31) the same day. After all the relevant papers and supporting materials had been filed, argument was heard on the dispositive motions on December 23, 1997, and they were taken under advisement.

At a further status conference on January 12, 1998, the Court orally ruled that under the terms of the contracts between the parties, the plaintiffs could recover on their breach of warranty claims even if they knew at the closing that what was warranted was not true. Eight days later at another status conference, the Court indicated that rulings would be made on the remaining issues raised by the parties' dispositive motions. Thus, at this juncture, the issues outstanding in the plaintiffs' motion for summary judgment on Count II are in a posture for decision.

1. Materials such as deposition testimony and documents are cited as the foundation for each undisputed fact in the plaintiffs' statement. Reference in the instant text shall only be to the enumerated undisputed facts, not to the specific supporting evidence.

## II. The Facts

The plaintiffs have filed a Statement Of Undisputed Facts In Support Of Their Motion For Summary Judgment (# 28) as to which the defendants have objected in part, and moved to strike. (# 35) In the course of recounting the background facts, the Court shall rely largely upon the Statement of Undisputed Facts to the extent that no objection has been interposed or that the particular objection is determined to be without merit. *See* Local Rule 56.1.

First, to identify the players: plaintiff Olympus, which was formed in the Spring of 1994 by plaintiff Kane, is the parent company of plaintiffs Pegasus and Kahuna. (# 28 ¶ 1)[1] Kahuna is the general partner of plaintiff Lahaina Realty. (*Id.*) The twelve named defendants were the owners, and ultimately the sellers, of six Connecticut nursing homes and their related assets. (# 28 ¶ 2)

Messrs. Kane and Konig met through a mutual friend in May of 1994 shortly after Mr. Kane had begun a search for nursing homes to be bought and managed by Pegasus. (# 28 ¶ 3) Through the various entities named as parties defendant, Konig owned the six nursing homes involved in this litigation. (*Id.*) With a view toward a potential sale of the real estate and assets, Konig gave Kane a tour of the six facilities and provided financial statements for the nursing homes as of September 30, 1993, that had been prepared by his outside accountants, Martin Friedman & Co. (*Id.*) As a result of the discussions which continued through June of 1994, the men agreed upon a tentative purchase price of $27 million for the six nursing homes and their related assets. (# 28 ¶ 4)[2] During the month of June, 1994, Kane and his attorney, Jack H. Fainberg, Esquire, began to negotiate the terms of an asset purchase agreement with Konig and his lawyer, Jay M. Silberner, Esquire. (# 28 ¶ 5)

2. The defendants object to the part of paragraph 4 reciting that Kane advised Konig of the purported manner he was employing to value the nursing homes. Although the hearsay objection is not well taken because the plaintiffs are not offering the statement for the truth, it matters not since the approach to valuation is not pivotal for present purposes.

Effective August 12, 1994, Pegasus entered into an Asset Purchase Agreement with the defendant-sellers whereby Pegasus would purchase the six nursing homes and related assets for $27 million. (# 28 ¶ 6) It is uncontested that in Article III of the Asset Purchase Agreement, defendant-sellers made several warranties, representations and covenants with regard to both the legal and financial status of the facilities and assets. (# 28 ¶ 6) Moreover, the preamble to Article III, entitled Warranties, Representations and Covenants of the Sellers, reads:

> To induce the Purchaser to execute and deliver this Agreement and to consummate the transactions contemplated hereby, the Sellers and Konig hereby make each of the representations, warranties and covenants set forth in this Agreement, including those set forth in this Article, each of which shall survive the execution and delivery of hereof (sic) and the Closing Date hereunder, all of which are material and have been relied upon by the Purchaser and each of which shall be true and correct in all respects as of the date hereof and as of the Closing Date hereunder.

Plaintiffs' Statement Of Undisputed Facts # 28 ¶ 6.

Numerous of the warranties delineated in Article III refer to information, as for instance certification defects and environmental issues, that was to be disclosed in schedules and exhibits to the Asset Purchase Agreement which as of August 12, 1994, had yet to be prepared by the defendant-sellers. (# 28 ¶ 7)

Under cover of a letter dated September 7, 1994, Attorney Silberner forwarded certain disclosure schedules to be attached to the Asset Purchase Agreement to Attorney Fainberg, and further advised "[t]here are no items to list on Schedules. . .3.10 [concerning licensing and certification defects][and] 3.11 [concerning environmental issues]. . .If you wish to make up a separate heading for each of those and say none, I have no problem with that." (# 28 ¶ 8)[3] While Pegasus was undertaking its due diligence prior to closing, the defendant-sellers requested that Pegasus help them in completing certain of the disclosure schedules. (# 28 ¶ 10) Pegasus agreed to assist in the preparation of the schedules, with the parties nonetheless specifically agreeing that "[t]he truth, accuracy and completeness of the Disclosure Schedules are the sole, complete and final responsibility of the Sellers." (*Id.*) On November 8, 1994, an assistant to Konig sent him a memorandum regarding the status of the disclosure schedules which reflected that "none" should be entered on schedule 3.10 (licensing and certification defects), that no information was set forth for inclusion in schedule 3.11 regarding environmental issues,[4] and further that schedule 3.14 regarding financial statements needed "updated financials—still outstanding." (# 28 ¶ 12) Approximately eight days later, Attorney Silberner wrote to Attorney Fainberg confirming, inter alia, that schedule 3.10 (licensing and certification defects) should read "none" and that schedule 3.11 (environmental issues) should include "[o]ne underground oil storage tank at Bidwell Health Center." (# 28 ¶ 13)

The Asset Purchase Agreement which was signed on August 12, 1994, contained the following provisions:

### ARTICLE IX

#### Indemnification

*Section 9.1 The Sellers' Obligations to Indemnify Purchaser.* The Sellers jointly and severally agree to indemnify and hold harmless Purchaser from and against any claim, loss, damage, liability, tax, interest, penalty, cost, suit, judgment, order, lien, obligation or expense whether administrative, judicial or otherwise (including, but

---

**3.** The defendants object to all or parts of paragraphs 8, 9 and 11 on the grounds that they incorporate text from letters of plaintiffs' counsel. According to plaintiffs, these paragraphs were proffered essentially for contextual reasons. Reference to these letters is unnecessary in this recitation of facts. Defendants also object to paragraph 10 because it purportedly characteriz-es the agreements between the parties. Only the text of the agreements will be included herein.

**4.** Pegasus had in fact notified the defendant-sellers that there was at least one underground storage tank at the Bidwell nursing home. (# 28 ¶ 12)

not limited to, reasonable attorneys', consultants', accountants' and expert witness fees), whether or not suit is brought arising (i) by reason of or from any misrepresentation or breach of any warranty contained in this Agreement including, but not limited to, Article III hereof; (ii) out of or in connection with any Retained Liabilities or other liabilities of any one or more of the Sellers; (iii) any federal, state or local taxes, penalties or interest assessed against any one or more of the Sellers or the Acquired Assets; (iv) by reason of or from a breach of any covenant or agreement made or to be performed by any one or more of the Sellers under or pursuant to this Agreement and any document given in connection herewith; (v) by reason of any failure of any one or more of the Sellers to transfer to Purchaser good and clear record and marketable title to any of the Acquired Assets; (vi) by reason of any failure to comply with applicable bulk sales or tax lien laws; (vii) by reason of enforcement of this indemnification provision; and (viii) reasonable costs and expenses (including without limitation, reasonable attorneys fees) incurred by Purchaser in connection with any matters indemnified against.

Each of the items set forth in this Section 9.1 shall be referred to as the "Purchaser Indemnified Claims". *Every representation, warranty, covenant and agreement of the Sellers set forth in this Agreement and every one of the rights and remedies of Purchaser for any one or more breaches of this Agreement by the Sellers shall survive and not be deemed waived by the Closing and shall be effective regardless of any inspection or investigation that may have been made at any time by or on behalf of the Purchaser or by its directors, officers, employees or agents or any prior knowledge by or on the part of the Purchaser or its directors, officers, employees or agents.* Appendix # 29, Exh. 1 (emphasis added).

On November 30, 1994, Pegasus purchased the six nursing homes for $25,910,904 of which $24,500,000 was cash and $1,410,904 in the form of a promissory note[5] payable to the defendant-sellers. (# 28 ¶¶ 15, 16) At the closing, the parties executed the First Amendment to Asset Purchase Agreement which amended some, and restated other, provisions of the Asset Purchase Agreement. (# 28 ¶ 15) One such change was that the first paragraph of Section 9.1 of the Asset Purchase Agreement was amended; the revised section with the changes in italics reads:

*Section 9.1 The Sellers' Obligations to Indemnify Purchaser.* The Sellers jointly and severally agree to indemnify and hold harmless Purchaser from and against any claim, loss, damage, liability, tax, interest, penalty, cost, suit, judgment, order, lien, obligation or expense whether administrative, judicial or otherwise (including, but not limited to, reasonable attorneys', consultants', accountants' and expert witness fees), whether or not suit is brought arising (i) by reason of or from any misrepresentation or breach of any warranty contained in this Agreement including, but not limited to, Article III hereof; (ii) out of or in connection with any Retained Liabilities or other liabilities of any one or more of the Sellers; (iii) any federal, state or local taxes, penalties or interest assessed against any one or more of the Sellers or the Acquired Assets; (iv) by reason of or from a breach of any covenant or agreement made or to be performed by any one or more of the Sellers under or pursuant to this Agreement and any document given in connection herewith; (v) by reason of any failure of any one or more of the Sellers to transfer to Purchaser good and clear record and marketable title to any of the Acquired Assets; (vi) by reason of any failure to comply with applicable bulk sales or tax lien laws; (vii) by reason of *any loss of claim incurred, arising or occurring on or prior to the Closing Date related to the failure of any of the Sellers to comply with the requirements of the State Department of Labor regarding workers' compensation; (viii) by reason of any loss of claim incurred, arising or accruing on or prior*

5. The purchase price was reduced by $589,096 which was reflected in the reduction of the face amount of the promissory note from $2,000,000 to $1,410,904. (# 28 ¶ 16)

**34**

*to the Closing Date related to any medical, health insurance or health benefit arrangement or practice whether formal or informal, which Sellers have provided or failed to provide to their employees or former employees; (ix) by reason of any or all Recoupment Claims and other amounts claimed by or owing to any Governmental Authority or Third Party Payor; (x) by reason of enforcement of this indemnification provision; and (xi) reasonable costs and expenses (including without limitation, reasonable attorneys fees) incurred by Purchaser in connection with any matters indemnified against. Purchaser acknowledges that it has been given credit of $200,000 for accounts receivable bad debts and it shall have no right to such reimbursement from Sellers with respect to accounts receivable owing from Governmental Authorities and/or Third Party Payors not included in the Closing Credits (i.e., $1,055,165.00).*

*Each of the items set forth in this Section 9.1 shall be referred to as the "Purchaser Indemnified Claims."*

Plaintiffs' Statement of Undisputed Facts # 28 ¶ 17.

The terms of the Asset Purchase Agreement set forth in italics on pages 9 and 10, *supra,* was not changed. However, a new Section 9 .6 was added in the First Amendment. That section reads as follows:

*Section 9.6 —Indemnification Threshold.* No Indemnitor shall have any obligation to indemnify an Indemnitee pursuant to Section 9.1(i) or Section 9.2(i) hereof unless: (i) any Indemnified Claim arising thereunder or in respect thereto incurred by such Indemnitee exceeds Twenty–Five Thousand Dollars ($25,000.00) (the "Single Occurrence Threshold"), or (ii) Indemnified Claims incurred by such Indemnitee, in the aggregate, exceed One Hundred Thousand Dollars ($100,000) (the "Aggregate Occurrence Threshold," and together with the Single Occurrence Threshold, the "Threshold Amount"). In such event, the Indemnitor shall be obligated to indemnify the Indemnitee for the entire amount of the Indemnified Claim incurred by such Indemnitee without regard to the Threshold Amount. In determining whether the aggregate amount for which the Indemnitee is entitled to be indemnified hereunder is at least the Threshold Amount, and in determining the aggregate amount of any Indemnified Claims hereunder, any requirement contained in this Agreement that any misrepresentation, or breach of warranty or covenant, or event or fact be "material" or have a "material" adverse effect in order to constitute a misrepresentation, omission, or breach of warranty, covenant or agreement under this Agreement shall be disregarded in its entirety. For purposes of this Section 9.6, the terms "Indemnitor," "Indemnitee" and "Indemnified Claim" shall have the meanings ascribed thereto in Section 9.3.

Appendix # 29, Exh. 2.

In addition, Section 9.5 of the Asset Purchase Agreement was deleted and restated to read as follows:

*Section 9.5 Right of Set–Off.* If a claim for indemnification is made by the Purchaser as the Indemnitee under this Article IX, the Purchaser may, at its option by written notice to the Sellers (and without limiting any other rights it may have at law or equity), withhold the amount of such Indemnified Claim from the amount of any payments otherwise due the Sellers under the Promissory Note...; provided however that such right of offset with respect to any misrepresentation by the Sellers of accounts receivable on the Financial Statements shall only apply to misrepresentations of accounts receivable owing from Governmental Authorities and/or Third Party Payors.

Plaintiffs' Statement of Undisputed Facts # 28 ¶ 19.

According to the terms of the promissory note, "[t]he Payor shall be entitled to set-off against payments of principal and interest payable under this Note in accordance with Section 9.5 of the Purchase Agreement and the Escrow Agreement therein referred to." (# 28 ¶ 20)

At the closing, the defendant-sellers executed and delivered a Side Letter to Pegasus which provided in relevant part:

The [Sellers] hereby represent[], warrant[], understand[], acknowledge[] and agree[] that notwithstanding the Assistance [of the Buyers]:

1. The truth, accuracy and completeness of the Disclosure Schedules are the sole, complete and final responsibility of the Sellers.

2. Attached hereto are the Disclosure Schedules in final form to be attached to the Asset Purchase Agreement.

3. The Sellers have carefully and completely reviewed and completed each Disclosure Schedule.

4. Each Disclosure Schedule as attached to the Asset Purchase Agreement on or prior to the date hereof is true and correct.

5. In the event that it is determined that any Disclosure Schedule fails to reveal or disclose any fact, matter, thing, occurrence or event, or is other wise inaccurate in any way, the Purchaser may, at its option, seek indemnification against [the Sellers] to the fullest extent permitted by Article IX of the Asset Purchase Agreement, notwithstanding any investigation that may have been made or information obtained at any time, including, without limitation, during the Assistance, by [Purchaser]. Without limiting the generality of the foregoing, nothing [Purchaser] or [Purchaser's] Representatives have done or may do, including, without limitation, the Assistance, shall limit, restrict, diminish or lessen any of [Purchaser's] rights, remedies, powers, or privileges set forth in the Asset Purchase Agreement or law.

Plaintiffs' Statement of Facts # 28 ¶ 21.

By virtue of paragraph 14 of the First Amendment to Asset Purchase Agreement, Section 3.14 of the Asset Purchase Agreement was deleted and restated to provide, at the time of closing:

> *Section 3.14 Financial Statements.* The Sellers have furnished to the Purchaser unaudited balance sheet (sic) of the Sellers and certified as being true and correct by the Chief Financial Officer or President of the Sellers, and the July Balance Sheet, copies of all of which are attached hereto as *Schedule 3.14* (the "Financial Statements"). The Financial Statements and the books and records of the Sellers which give rise thereto are complete and accurate in all material respects and not misleading, and the Financial Statements present fairly the assets, liabilities, operations and financial condition of the Sellers and the results of their respective business operations and have been prepared in conformity with GAAP. Except as set forth in the Schedules hereto, none of the Sellers has any material liabilities as of the date of the Financial Statements which are not reflected therein, including, without limitation, contingent liabilities, except for liabilities incurred in the ordinary course of its business not in excess of $25,000.00 in the aggregate...

Plaintiffs' Statement of Facts # 28 ¶ 22.

Additionally in Section 2.10.2 of the Asset Purchase Agreement, as amended, the defendant-sellers warranted that "[t]he Closing Statement [Schedule 2.7(a)] has been prepared in accordance with GAAP and prepared on a consistent basis in the preparation of the Financial Statements." (# 28 ¶ 23)

Pegasus notified the defendant-sellers by letter dated August 28, 1995, that it was asserting a claim for indemnification against them consequent to numerous alleged misrepresentations and breaches of warranties set forth in the Asset Purchase Agreement, as amended. (# 28 ¶ 24) [6] According to the letter, these misrepresentations and breaches of warranties caused damages to Pegasus in excess of the face amount of the promissory note. (# 28 ¶ 24) The defendant-sellers did not respond to the demand for indemnification, but rather declared a default under the terms of the promissory note.

Lastly, Section 11.14 of the Asset Purchase Agreement provides that the "...Agreement, including the validity thereof and the

---

6. The defendants do not object to paragraph 24 referencing letters between the parties to the extent that the letters are considered admissible only for the purpose of showing notice of their respective claims.

rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Connecticut." (Appendix # 29, Exh. 1)

This recitation is sufficient to set the contextual stage. Further specific facts with respect to the purported breaches of warranties shall be delineated when addressing the merits of the plaintiffs' motion.

### III. The Summary Judgment Standard

When considering whether to grant summary judgment, the court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the court must "accept all reasonable inferences favorable to the nonmovant." *Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 205 (1 Cir.1996); *see also Lawton v. State Mut. Life Assurance Co. of America*, 101 F.3d 218, 222–23 (1 Cir.1996); *Borschow Hospital and Medical Supplies v. Cesar Castillo, Inc.*, 96 F.3d 10, 12 (1 Cir.1996); *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1 Cir.1996); *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 608 (1 Cir.1996).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine," the court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.; see also Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 25 (1 Cir.1997); *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1 Cir.1996); *Roche*, 81 F.3d at 253. In weighing whether a factual dispute is "material," the court must

examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Vinick v. Commissioner of Internal Revenue*, 110 F.3d 168, 171 (1 Cir.1997); *Sanchez*, 101 F.3d at 227; *Roche*, 81 F.3d at 253. "Thus the substantive law defines which facts are material." *Sanchez*, 101 F.3d at 227 (citing *Anderson*, 477 U.S. at 247–48).

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. *See Int'l Ass'n of Machinists and Aerospace Workers*, 103 F.3d at 205 (quoting *Wynne v. Tufts Univ. School of Med.*, 976 F.2d 791, 794 (1 Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470(1993)("The core purpose of the summary judgment procedure is to 'pierce the boilerplate of the pleadings' and evaluate the proof to determine whether a trial will serve any useful purpose.")). Rather, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### IV. DISCUSSION

#### A. Must Plaintiffs Prove Reliance to Recover on Express Warranties?

The primary ground of defendants' opposition to the plaintiffs' motion for summary judgment on the warranty claim is that plaintiffs cannot prove that they relied on the warranties because, as a result of the activities conducted during the due diligence period, the plaintiffs knew that the actual facts were not as warranted. The plaintiffs argue that when an express warranty is a "bargained for" term of a contract, reliance is not necessary.[7]

---

7. The plaintiffs concede that reliance is a necessary element of tort claims based on misrepre-

sentation.

The issue does not appear to have been the subject of any reported cases applying Connecticut law. Decisions in other jurisdictions are divided. As noted, *supra*, at page 3, the Court issued an *ore tenus* ruling at the January 12, 1998, conference that if faced with the issue on the facts of this case, the Connecticut Supreme Court would hold that reliance is not a necessary element of proof on a contractual claim based upon a "bargained for" express warranty. An explication of that decision follows.

There can be no doubt that the express warranty/indemnification provisions of the final contract between the parties (the Asset Purchase Agreement executed in August and the First Amendment thereto executed in November) were part of the basis of the bargain between the parties. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 360 (2 Cir.1992)(applying New York law). The insertion of Section 9.6 of the First Amendment providing, in essence, that there was to be no indemnification "...by reason of or from any misrepresentation or breach of any warranty contained in th[e] Agreement" unless the claim exceeded $25,000 (the "Single Occurrence Threshold") or, if there is more than one claim, unless the claim exceeded $100,000 (the "Aggregate Occurrence Threshold") when there were no such thresholds in the original Agreement clearly demonstrates that these provisions were "bargained for" by both parties. In the First Amendment, the buyers were able to retain their right to indemnification after initial thresholds, but the sellers were protected from claims which did not reach the thresholds.

Support for the principle that reliance in these circumstances is not an element of a cause of action for breach of an express warranty in a contract is the New York Court of Appeals' decision in *CBS, Inc. v. Ziff-Davis Publishing Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990). In that case, CBS contracted to purchase some magazine businesses from Ziff-Davis on the basis of financial data supplied by Ziff-Davis. *Id.*, 75 N.Y.2d at 505-6, 554 N.Y.S.2d at 454, 553 N.E.2d at 1002. In the written contract, Ziff-Davis warranted that the audit and expense reports of the businesses had been prepared in accordance with generally accepted accounting principles and that the profitability of the businesses had not changed from the time of the reports to the time of closing. *Id.*, 75 N.Y.2d at 500, 554 N.Y.S.2d at 450-1, 553 N.E.2d at 998. Between the time of the signing of the contract to purchase and the closing, CBS conducted its own "due diligence" and found that the reports were not prepared in accordance with generally accepted accounting principles and that they did not fairly depict the financial condition of the businesses. *Ziff-Davis*, 75 N.Y.2d at 500, 554 N.Y.S.2d at 451, 553 N.E.2d at 999. Ziff-Davis disagreed, and despite its doubts, CBS closed. *Id.* However, closing was on the express understanding that the closing would "...not constitute a waiver of any rights or defenses either of us may have" under the purchase agreement. *Id.*, 75 N.Y.2d at 501, 554 N.Y.S.2d at 451, 553 N.E.2d at 999. Nonetheless, the trial court dismissed CBS' suit on the warranty on the ground that CBS had not relied on what was warranted.

The New York Court of Appeals, relying in part on the decision in *Ainger v. Michigan General Corp.*, 476 F.Supp. 1209 (S.D.N.Y. 1979), held that in the case of express warranties which form part of a contract:

> The critical question is not whether the buyer believed in the truth of the warranted information...but "whether [it] believed [it] was purchasing the [seller's] promise [as to its truth]." (*Ainger v. Michigan General Corp., supra*, at 1225 [other citations omitted]). This view of "reliance"—i.e., as requiring no more than reliance on the express warranty as being part of the bargain between the parties—reflects the prevailing perception of an action for breach of express warranty as one that is no longer grounded in tort, but essentially in contract. (*See, Ainger v. Michigan General Corp., supra*, at 1225 [other citations omitted]). The express warranty is as much a part of the contract as any other term. Once the express warranty is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made

38

in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached [citations omitted].

*Ziff–Davis,* 75 N.Y.2d at 503–4, 554 N.Y.S.2d at 453, 553 N.E.2d at 1000–1.

Two years after *Ziff–Davis* was decided, the Court of Appeals for the Second Circuit had occasion to apply the holding in a diversity case, i.e., *Galli v. Metz,* 973 F.2d 145 (2 Cir.1992). In that case, the sellers of a business warranted that they knew of no facts which would result in any claim being brought against the business. *Id.* at 150. Two years after closing, a claim was made against the business for an alleged release of hazardous substances at a site operated by the business. *Id.* There was no dispute that the seller had known of the contamination before the closing. *Id.* However, the District Judge denied the buyer relief because the problem had been disclosed to the buyer prior to the closing. *Id.*

The Court of Appeals reversed and remanded the case for findings as to how the buyer knew of the problem. However, it noted that:

In *Ziff–Davis,* there was a dispute at the time of closing as to the accuracy of particular warranties. *Ziff–Davis* has far less force where the parties agree at closing that certain warranties are not accurate. Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, *unless the buyer expressly reserves his rights under the warranty (as CBS did in Ziff–Davis), we think the buyer has waived the breach.*

*Galli,* 973 F.2d at 151 (emphasis supplied).

Thus, although reliance is a not necessary element to recover on a breach of an express warranty in a contract, a defendant in such a case may prove that the party asserting the warranty had full knowledge at the time the contract was signed that the warranty was not true but entered the contract anyway, thereby waiving any claim for breach of the warranty. However, such a defense would not appertain if the party to whom the warranty was given "expressly preserves his rights." *Id.* at 150. The rule has been followed by federal courts applying New York law. *Rogath v. Siebenmann,* 129 F.3d 261, 264–5 (2 Cir.1997); *In Re Chateaugay Corp.,* 155 B.R. 636, 650–1 (Bankr.S.D.N.Y.1993), *aff'd,* 108 F.3d 1369, 1997 WL 138384 (2 Cir.1997).

In the instant case, there can be no doubt that the buyers expressly reserved their rights by the second paragraph of Section 9.1 of the Agreement quoted, *supra,* providing that "Every...warranty...set forth in this Agreement and...the rights and remedies...for any one or more breaches of this Agreement by the Sellers shall...not be deemed waived by the Closing and shall be effective regardless of any...prior knowledge by or on the part of the Purchaser...." It is to be recalled that this language was restated in the First Amendment; the concept is also included in the Side Letter which the defendants delivered to the plaintiffs at closing. *See, supra,* at pp. 14–15.

Thus, if the law of Connecticut were as set forth in the *Ziff–Davis* and *Galli* cases, the plaintiffs would not have to prove reliance on their contractual claims for breach of express warranties and the defendants would be unable to prevail on an affirmative defense that the plaintiffs waived any of the breaches. A review of the law in jurisdictions other than New York is in order.

Several cases decided both before and after the decision in *Ziff–Davis* have reached the same legal conclusion. In the case of *Glacier General Assurance Co. v. Casualty Indemnity Exchange,* 435 F.Supp. 855 (D.Mont.1977), cited in *Ziff–Davis,* the court wrote:

The problems of a reliance, and a right to rely, on the representations do not appear when the action is grounded in warranty. The warranty is as much a part of the contract as any other part, and the right to damages on the breach depends on nothing more than the breach of warranty.

*Glacier,* 435 F.Supp. at 860.

Evidently, there was no question in the *Glacier* case of a waiver of the right to rely on

the breaches of express warranty. To the same effect is *Shambaugh v. Lindsay*, 445 N.E.2d 124, 126–7 (Ind.App. 3 Dist.1983)[8] and *Wechsler v. Long Island Rehabilitation Center of Nassau, Inc.*, 1996 WL 590679 * 21–2 (Mass.Super.1996) applying Indiana and Massachusetts law respectively. It is interesting to note that neither of these courts would seem to apply the doctrine of waiver as enunciated in the *Galli* case.

However, there are cases which go the other way. In the case of *Land v. Roper Corp.*, 531 F.2d 445 (10 Cir.1976), the Tenth Circuit, applying Kansas law, found that reliance was an essential element of a claim for breach of an express warranty found in a contract. *Land*, 531 F.2d at 447–9. In the case of *Kazerouni v. De Satnick*, 228 Cal. App.3d 871, 279 Cal.Rptr. 74 (2 Dist.1991), the court, with no reference to the *Ziff–Davis* line of cases, held that the California Uniform Commercial Code, section 2313, which does not require reliance to recover on an express warranty, applies only to a sale of goods and not to a sale of business. In the latter situation, reliance must be proved to recover for breach of an express warranty in a contract. Lastly, in the case of *Hendricks v. Callahan*, 972 F.2d 190 (8 Cir.1992), the Eighth Circuit Court of Appeals, applying Minnesota law, held that the Supreme Court of Minnesota, if faced with the situation, would not follow the *Ziff–Davis* line of cases and "would require some sort of reliance." *Id.* at 194.

I am not persuaded that the Connecticut Supreme Court, if faced with the issue, would follow these three cases. First, the *Land* and *Hendricks* decisions were by federal Courts of Appeals that were trying to divine the state law in circumstances in which the highest court in the state had not been presented with the issue. Thus, there was no discussion of the merits of the conflicting legal doctrines; rather, the effort was to discern what the state of the law in those

states was. The *Kazerouni* decision is rather summary and does not appear to acknowledge the conflicting legal doctrines.

However, more important for present purposes, in none of the three cases was there a clause such as found in the second paragraph of Section 9.1 in the instant case in which the parties, in effect, agreed that an action for breach of express warranty would lie even if there had been no reliance. I can find no case in which a court, in the face of such a provision, required a party relying on an express warranty found in a contract to prove reliance on the warranty in order to succeed.

■ For these reasons, I rule that the Connecticut Supreme Court, if faced with the issue raised in this case in the particular circumstances of this case, would hold that the plaintiffs do not have to prove reliance on the express warranties delineated in the Asset Purchase Agreement and First Amendment in order to prevail on their claim for breach of those warranties. Therefore, the Court will not deny plaintiffs' motion for summary judgment on the warranty claim on the ground that the plaintiffs have failed to adduce proof of reliance on the express warranties.

### B. Are There Disputed Issues of Fact as to Whether the Defendants Breached the Warranties as Alleged?

The bulk of the parties' arguments addresses the issue of whether the plaintiffs must prove reliance in order to succeed. On the question of whether or not the defendants breached the express warranties as alleged, the defendants proffer little, if any, evidence to dispute the factual showing presented by the plaintiffs to establish the merits of their claims.

Turning first to the breaches of warranties regarding certification defects, the defen-

---

8. A later decision by the Court of Appeals (First District) of Indiana held that a party could not rely on an express warranty in a contract which the party knew to be untrue when the contract contained further language to the effect that no warranty could be relied on "if and to the extent that [the] party [relying on the warranty] knows

that such...warranty is untrue or misleading." *Jackson v. Russell*, 498 N.E.2d 22, 36 (Ind.App. 1 Dist.1986), *appeal after remand*, 533 N.E.2d 153, (Ind.App. 1 Dist.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1297, 108 L.Ed.2d 474 (1990). This last clause is the direct opposite of the clause in the contract in the instant case.

dants do not object to the following facts set forth in the plaintiffs' Statement of Facts:

32. In Section 3.10 of the Asset Purchase Agreement, Defendant–Sellers represented and warranted, *inter alia*, that:

(a) All tangible components of the Facilities material to the use, occupancy and operation of the Properties and the Facilities (including, without limitation, the HVAC, plumbing, electrical and other building systems) ... to the best of Sellers' knowledge, conform in all material respects with all applicable ordinances and regulations, and with all building, zoning, fire, safety and other codes, laws and orders, if any, and with the standards of the fire insurance rating association with jurisdiction. None of the Sellers has received any orders, notices or allegations of violations from any Governmental Authority or from any insurer relating to the Facilities or the operations thereof.

(b) Except as disclosed on *Schedule 3.10* hereto, none of the Sellers has received any notice of, nor has any knowledge of, any claim, requirement or demand of any Governmental Authority, Accreditation Body, Third Party Payor or any insurance body having or claiming any licensing, certifying, supervising, evaluating or accrediting authority over any one or more of the Facilities to (i) remedy any violation (x) at any one or more of the Facilities, (y) by any of the Facilities' professional staff or (z) with respect to any of the Facilities' professional services, procedures or practices in any material respect, or (ii) provide additional furniture, fixtures, equipment or inventory so as to make such Facility conform or comply with any applicable law or accreditation requirements.

(c) Except as disclosed on *Schedule 3.10,* none of the Sellers nor any agent, employee, Affiliate or other Person acting on behalf of the Sellers has received notice from any Governmental Authority of a violation or an alleged violation of compliance, or of a noncompliance or an alleged noncompliance, of any one or more of the Properties or the Facilities with any applicable zoning ordinances, building codes and other applicable laws, rules or regulations of Governmental Authorities having jurisdiction thereover . . .

Asset Purchase Agreement, App. Exh. 1, pp. 27–28.

33. Schedule 3.10 of the Asset Purchase Agreement does not disclose any exceptions to the representations and warranties set forth in Section 3.10 of the Asset Purchase Agreement. (App.Exh. 1.)

34. As a result of inspections of the six nursing homes which were conducted by the Connecticut Department of Health and Addiction Services immediately prior to the closing, the Connecticut Department of Health and Addiction Services required Pegasus to commit to extensive repairs and improvements of the physical plants at the six nursing homes and, in addition, to agree to employ an extra free floating nursing supervisor at each of the homes, in order to bring the homes into compliance with the Connecticut Health Code and as a condition of receiving certification. (*See* Consent Orders entered into by and between Pegasus and the Connecticut Department of Health and Addiction Services for each of the six nursing homes, App. Exh. 17.)

Plaintiffs' Statement of Facts # 28 ¶¶ 32–4.

■ This evidence is sufficient to support a finding as a matter of fact that the defendants breached the warranties regarding certification defects in the Asset Purchase Agreement, as amended. That Pegasus agreed to undertake the repairs and improvements pursuant to the terms of the consent orders quite simply does not serve to absolve the defendants from liability for their breaches or otherwise somehow supercede their obligations.

Much the same is true with respect to the alleged breaches of the environmental warranties. The defendants do not contradict the following facts:

35. In Section 3.11 of the Asset Purchase Agreement, Defendant–Sellers represented and warranted, *inter alia*, that:

(a) There are no Hazardous Substances present at, nor is there or has there been any Hazardous Substances dumped, spilled or disposed of at, on, under or upon any of the Properties or the Facilities . . . except for medical supplies, medical waste and cleaning supplies used and stored in accordance with all applicable laws.

&ast; &ast; &ast; &ast; &ast; &ast;

(d) Except as set forth on *Schedule 3.11* hereto, no underground storage tanks are on any of the Properties.

Asset Purchase Agreement, App. Exh. 1, pp. 28–29.

37. Schedule 3.11 of the Asset Purchase Agreement discloses the existence of one underground storage tank at the Bidwell Facility. (Asset Purchase Agreement, App. Ex. 1, Schedule 3.11.) In fact, there exists a total of five underground storage tanks at the facilities. (Opposition of William S. Donovan, Jr., App. Exh. 24, p. 46 Ins. 17–18; Environmental Site Assessment Reports, App. Ex. 18.)

Plaintiffs' Statement of Facts # 28 ¶¶ 35, 37.

█ Although the defendants object to paragraph 36 of the plaintiffs' statement of facts, they do not contest Appendix (# 29) Exhibit 18, Environmental Site Assessments, cited as authority for the paragraph. These environmental site assessments support a finding that fuel had leaked "from a 1,000–gallon steel No. 2 fuel oil UST" at the Pine Manor property and that a fuel spill had occurred at the Bidwell facility. (# 29, Exh. 18, Environmental Site Assessment Park Manor Health Care at p. 11 [Bates PEG 00579] and Environmental Site Assessment Bidwell Health Care Center at pp. 9–10 [Bates PEG 00074–00075]) Based upon the undisputed evidence, the plaintiffs have proven that the defendants breached the environmental warranties in the Asset Purchase Agreement, as amended.

The third and final group of warranties at issue consists of the financial ones. Preliminarily, the parties agree that

Pursuant to Section 3.14 of the Asset Purchase Agreement, as amended, Defendant–Sellers provided Pegasus with the July 1994 Balance Sheets for each of the six nursing homes. (App.Ex. 5.) Pursuant to Section 2.10.2 of the Asset Purchase Agreement, as amended, Defendant–Sellers provided to Pegasus Schedule 2.7(a) at the closing. (First Amendment, App. Ex. 2, Schedule 2.7(a).)

Plaintiffs' Statement of Facts # 28 ¶ 25.

The defendants have objected to the plaintiffs' statement of facts to the extent that it thereafter relies on the expert report of Darrell G. Pataska, C.P.A., which the defendants assert is hearsay. There is no need to rule on the hearsay objection since the plaintiffs have now submitted the affidavit of Mr. Pataska, and this document is plainly admissible.[9] (Plaintiffs' Opposition # 46, Exh. A)

In his affidavit, Mr. Pataska lists the extensive amount of information that he considered and upon which he bases his various opinions. (# 46, Exh. A ¶ 3) Thereafter, the expert offered the following opinions:

5. Based upon my review and analysis of the information listed above, it is my opinion that the July 1994 Balance Sheets and the September 30, 1993 Balance Sheets for the Six Nursing Facilities did not present fairly the financial condition of these facilities in accordance with Generally Accepted Accounting Principles ("GAAP").

6. It is my opinion that the Accounts Receivable shown in the July 1994 Balance Sheets and the September 30, 1993 Balance Sheets for the Six Nursing Facilities was overstated as a result of accounting procedures which, as applied, were not in accordance with GAAP.

7. The Accounts Receivable of the Six Nursing Facilities shown on the July 1994 Balance Sheets and the September 30, 1993 Balance Sheets, were purportedly computed using the Direct Write Off Method. It is my opinion that under GAAP, use of the Direct Write Off Method is only appropriate if the reporting entity has a history of immaterial uncollectible

---

9. The defendants do not suggest that Mr. Pataska is not qualified to testify to the opinions that he gives. Indeed, based upon his curriculum vitae appended to his affidavit, Mr. Pataska is qualified as an expert to render the opinions he has proffered.

receivables, and if an analysis of the receivables at the time that they are reported supports the conclusion that the potential amount of uncollectible receivables is immaterial. It is my opinion that use of the Direct Write Off Method is not appropriate where the reporting entity has a history of uncollectible receivables, or has not performed an analysis of its receivables to assess potential collectibility issues at the time of presentation.

8. Based upon my review and analysis of the information listed above, it is my opinion that the use of the Direct Write Off Method was inappropriate and not in accordance with GAAP. As a result, it is my opinion that the receivables for each of the entities were overstated by a material amount.

9. Based upon my review and analysis of the information listed above, it is my opinion that the July 1994 Balance Sheets and the September 30, 1993 Balance Sheets should have included an allowance (reserve) for uncollectible accounts. It is my opinion that as a result of the failure to include such an allowance against the receivables, the amounts of the receivables presented on the July 1994 and September 30,1993 Balance Sheets were not presented fairly in accordance with GAAP.

12. Based upon my review and analysis of the information listed above, it is my opinion that the Liabilities reported for the Six Nursing Facilities on the July 1994 Balance Sheets and the September 30, 1993 Balance Sheets were understated as a result of accounting procedures which, as applied, were not in accordance with GAAP.

13. Based upon my review and analysis of the information listed above, it is my opinion that the Liabilities reported on the July 1994 Balance Sheets and the September 30, 1993 Balance Sheets for the Six Nursing Facilities were materially understated because the balance sheets did not include liabilities due to the State of Connecticut Medicaid Program ("Medicaid") which arose by virtue of changes in Medicaid reimbursement rates which were in effect on or before July 31, 1994.

14. Based upon my review and analysis of the information listed above, it is my opinion that the failure to account for Liabilities due to Medicaid as a result of such rate changes was inappropriate and not in accordance with GAAP.

20. Based upon my review and analysis of the information listed above, it is my opinion that Schedule 2.7(a) did not present fairly the Current Assets of the Six Nursing Facilities in accordance with the GAAP.

21. Based upon my review and analysis of the information listed above, it is my opinion that the Accounts Receivable shown on Schedule 2.7(a) for the Six Nursing Facilities was overstated as a result of accounting procedures which, as applied, were not in accordance with GAAP.

22. Based upon my review and analysis of the information listed above, the Accounts Receivable of the Six Nursing Facilities shown on Schedule 2.7(a) were purportedly computed using the Direct Write Off Method. It is my opinion that under GAAP, use of the Direct Write Off Method is only appropriate if the reporting entity has a history of immaterial uncollectible receivables, and if an analysis of the receivables at the time that they are reported supports the conclusion that the potential amount of uncollectible receivables is immaterial. It is my opinion that use of the Direct Write Off Method is not appropriate where the reporting entity has a history of uncollectible receivables, or has not performed an analysis of its receivables to assess potential collectibility issues at the time of presentation.

23. Based upon my review and analysis of the information listed above, it is my opinion that the use of the Direct Write Off Method was inappropriate and not in accordance with GAAP. As a result, it is my opinion that the receivables for each of the entities were overstated by a material amount.

24. Based upon my review and analysis of the information listed above, it is my opinion that the statement of Accounts Receivable in Schedule 2.7(a) should have included an allowance (reserve) for uncollectible

accounts with respect to receivables owing from Governmental Authorities and/or Third Party Payors. As a result of the failure to include such an allowance against the receivables, it is my opinion that the amounts of the receivables presented on Schedule 2.7(a) was not presented fairly in accordance with GAAP.

Plaintiffs' Opposition # 46, Exh. A ¶¶ 5–9, 12–14, 20–24.[10]

On their part, during the course of discovery the defendants produced a four page expert report of John H. Kelleher, C.P.A. (# 28 ¶ 27) Nothing in Mr. Kelleher's expert report contradicts Mr. Pataska's opinions that the accounting procedures, as applied by the defendants, and the financial documents were not in accordance with GAAP. The sole references to GAAP in Mr. Kelleher's report are these statements:

1.   c.) The Compilation Reports by Martin A. Friedman & Co. CPAs for 9/30/93 and for 9/30/92 were indicated as compiled in accordance with standards established by the American Institute of Certified Public Accountants and do not specifically otherwise state that GAAP is not adhered to therein or in the underlying records.

6.   I also conclude that the financial documents provided were, in some immaterial respects, not in conformity with GAAP and that the Buyers had the information and the ability to make the transition to the amounts which would conform.

Appendix # 29, Exh. 26 ¶¶ 1.c, 6.

██  Indeed, nothing in Mr. Kelleher's report squarely disputes Mr. Pataska's opinions in the terms in which they are rendered.[11] In other words, the plaintiffs have presented evidence via their expert that establishes breaches of the financial warranties set forth in the Asset Purchase Agreement, as amended, and nothing in Mr. Kelleher's report is sufficient to raise a genuine issue of material fact with respect to the defendants' liability for those breaches.

### V.  Conclusion

For all the reasons stated it is ORDERED that the Plaintiffs' Motion For Summary Judgment As To Liability On Count II (Breach Of Warranty) (# 26) be, and the same hereby is, ALLOWED.

---

10.  The defendants do not contest that at his deposition, Martin Friedman of the defendant-sellers outside accounting firm, Martin Friedman & Co., "acknowledge[d] that the July 1994 Balance Sheets were 'definitely not presented according to GAAP.'" (# 28 ¶ 28)

11.  In his affidavit, Mr. Pataska rebuts one part of Mr. Kelleher's report:

18.  In Paragraph 3(a) of the Kelleher Report, Mr. Kelleher states that my opinion as to the overstatement of assets ("accounts receivable") on 9/30/93 and 7/31/94 is based on knowledge acquired after the business asset purchase that certain accounts receivable have not been collected by the Buyers. This contention is absolutely untrue. My opinion with respect to the 9/30/93 and 7/31/94 financial statements is based solely on information which was in the possession of the Sellers prior to the presentment of those financial statements to the Buyers and/or prior to the closing of the transaction on 11/30/94.

Plaintiffs' Opposition # 46, Exh. A ¶ 18.