**GLACIER GENERAL ASSURANCE COMPANY, a Montana Corporation, Plaintiff,**

v.

**CASUALTY INDEMNITY EXCHANGE, a Missouri multiple line reciprocal insurer, et al., Defendants.**

Civ. No. 75–4–M.

United States District Court,
D. Montana,
Missoula Division.

Aug. 11, 1977.

---

Dexter L. Delaney, Mulroney, Delaney, Dalby & Mudd, Missoula, Mont., for plaintiff.

Sherman V. Lohn, Garlington, Lohn & Robinson, Missoula, Mont., for defendants.

## OPINION

RUSSELL E. SMITH, Chief Judge.

The opinion in this case filed March 2, 1977, is withdrawn, and the judgment entered May 2, 1977, is vacated.

By a motion to amend the judgment, plaintiff strenuously asserts a right to rescission of a loss fund agreement, and in support of its right to rescind, states that the money judgment heretofore awarded is inadequate relief because the defendants are insolvent.

Plaintiff is entitled to monetary relief and is not entitled to a rescission.

The facts are:

Plaintiff, Glacier General Assurance Company (Glacier), is a multiple-line insurance company. John Hayden (Hayden) is its president and chief executive officer.

Casualty Indemnity Exchange (CIE) is an insurance exchange owned by its policyholders but managed by Manlin Service Corporation (Manlin), as attorney-in-fact. Manlin was owned by a firm of insurance brokers, Pritchard & Baird, until 1973 when it was sold to Vipont Chemical Company

(Vipont) by Charles H. Pritchard and William G. Pritchard, in exchange for 609,000 shares of the stock of Vipont.

During the years 1969 through 1974 CIE sold medical malpractice insurance policies to doctors. It retained some part of the coverage but reinsured with excess carriers, one of which was Glacier. Pritchard & Baird acted as brokers in the placement of the excess coverage.

In the years 1970, 1971, and 1972, and in the first part of 1973, Glacier received notice of relatively few claims. In late 1973 and early 1974 Glacier was deluged with claims. At about the same time Hayden discovered that Pritchard & Baird, contrary to the agreements made with Glacier, had reinsured with Glacier portions of the excess CIE coverage for which other excess carriers were liable. This had the effect of pyramiding Glacier's coverage on the CIE malpractice book of insurance.

On May 13, 1974, Hayden and Glacier's attorney went to Denver to examine the CIE files. Their principal concern was the late reporting, and they did confirm that the reporting had been seriously delayed.

In late May 1974 Glacier received from another reinsurer the Von Gunten report (Ex. 2). The report cast serious doubts on the solvency of CIE and indicated that CIE had seriously delayed in reporting its losses and had arbitrarily reduced its loss reserves and had back-dated the changes. At the trial, two witnesses, former underwriters for CIE, testified that in 1974 they had, at the direction of the CIE president, Rickard, gone through the files and arbitrarily reduced the loss reserves by 32% and in an amount of approximately $4,000,000 and had back-dated the changes to December 1973. These altered reserve figures appear in the 1973 annual statement. I find this to be true.

In June 1974 Glacier filed an action in this court (CV 74–68–M), naming Pritchard & Baird, Manlin, and CIE as parties, in which it sought actual and punitive damages and a judgment that Glacier be held harmless on any losses resulting from the reinsurance placed by Pritchard & Baird.

The complaint alleged the late reporting and the excess coverage pyramidings as grounds for relief. At or about the same time Glacier ceased paying the reinsurance claims made by CIE.

In the meantime, the regulatory bodies in Missouri and California had been looking at CIE, and in March 1974 the Missouri Division of Insurance and the California Department of Insurance commenced an audit of CIE for the years 1971, 1972, and 1973. A preliminary report of the audit was completed in April of 1974. According to the audit, CIE was insolvent and the reserves had been arbitrarily adjusted without regard to the facts of the particular cases involved. Atwood, a qualified actuary from the California department, developed the formula by which the deficiency in reserves was determined. As a result of this audit CIE was placed in charge of a conservator in May 1974.

Because of the Glacier lawsuit and complaints from other excess carriers, Pritchard & Baird made efforts to effect a solution of the problem, and in the course of those efforts proposed to Glacier that it take over CIE's liability and some of the reinsurance liability in exchange for a cash consideration and the dismissal of Glacier's pending lawsuit. The proposal contained a series of calculations as follows:

| | |
|---|---|
| C.I.E. Net case loss reserves | $ 2,107,300 |
| Net unpaid loss adjustment expense | 1,542,950 |
| | $ 3,650,250 |
| less savings on Net (see Begos letter) | –1,825,125 |
| Subtotal | $ 1,825,125 |
| Plus C.I.E. net IBNR | 1,200,000 |
| Total Net | $ 3,025,125 |
| Excess loss reserves | $ 6,393,479 |
| less savings on Excess (see Begos letter) | –2,924,452 |
| Subtotal | $ 3,469,027 |
| Plus Excess IBNR (Begos estimate) | 2,500,000 |
| Total Excess | $ 5,969,027 |

(Ex. 3)

These figures were in turn based on what was referred to in the evidence as the Begos Report. Begos was a lawyer said to be expert in medical malpractice matters who had been employed by CIE to report on the adequacy of the CIE loss reserves. He reported that CIE was over-reserved in the

amount of $600,000. The Pritchard & Baird proposal figures were based on the CIE determinations of its loss reserves.

William Pritchard and Pritchard & Baird were the agents of CIE in all of the negotiations leading to the execution of the loss fund agreement.

On July 25, 1974, the California Department of Insurance held a hearing to determine whether a cease-and-desist order should be entered as to CIE. Hayden appeared at the hearing as the representative of Glacier. At the hearing Atwood expressed his opinion, in accordance with his report, that deficiencies existed in the loss reserves in the amount of $3,251,219. CIE submitted evidence that CIE was over-reserved in the amount of $600,000. At the hearing the Pritchard & Baird proposal to Glacier was described by Hayden, who said that he had intimate knowledge of some 600 claim files, that he had read the Begos Report and the Von Gunten Report, that he had reviewed claims in the offices of CIE. When asked the question:

> You're satisfied in your own mind that you have sufficient knowledge about both reported and unreported claims of CIE to establish an opinion in your own mind as to whether or not this is a reasonable treaty to enter into?

Hayden answered "yes." (Insurance hearing, July 25, 1974, p. 91.)

At the conclusion of the hearing, the hearing officer, Lawrence Baker, orally found that CIE was in a "hazardous condition" and had engaged in practices which, under the provisions of the insurance code, would constitute fraud.

After the hearing, Baker discussed the Pritchard & Baird proposals and expressed surprise that Glacier would undertake the risks outlined in them for a then contemplated cash consideration of $9,233,000. Baker was interested in the financial capacity of whoever should take over the CIE malpractice risks. He wanted Glacier to be fully informed as to the size of the risk before it accepted the Pritchard & Baird proposals. For that reason he asked Atwood, the actuary, to talk to Hayden. Atwood discussed his report with Hayden. The report fixed the expected gross liability of CIE and its excess carriers at $32,058,315, of which, under the proposal, Glacier would assume $23,044,850. The actual cost to Glacier, considering a 9% interest rate on money invested, was expected to be $16,000,000. Hayden told Atwood that, because Glacier would be settling claims in the name of CIE, known to be in trouble, the claims could be settled more cheaply.

On July 31, 1974, Glacier and CIE signed a loss fund agreement which by its terms was to be effective only when approved by the insurance departments of Missouri and California. CIE had difficulty in providing funds, and Glacier, on September 23, advised all concerned that, unless the agreement was performed by October 1, 1974, Glacier's offers would be withdrawn. However, on October 10, Glacier and CIE petitioned the Director of the Division of Insurance of Missouri, the Commissioner of Insurance of California, and the Commissioner of Insurance of Montana, pursuant to Revised Statutes of Missouri 1969 § 375.241, to approve the agreement. The petition was set for hearing before representatives from each of the three concerned insurance departments, and a hearing was held on October 23, resulting in an order approving the loss fund agreement (with some upward adjustment of the amounts to be paid to compensate Glacier for its losses incurred by the delay). By October 31, 1974, the necessary funds were collected and the necessary documents signed, and the loss fund agreement became fully effective. The fund, in the total sum of $11,428,658.74, with which payment was made to Glacier, was composed of contributions made by CIE and a large number of reinsurers. For this cash consideration Glacier assumed the liabilities expressed in the loss fund agreement. The reinsurers (including Glacier, whose liabilities under their reinsurance treaties were very substantial) were, with some specific exceptions, released from liability on their reinsurance treaties by CIE. The reinsurers released such claims as they had against Pritchard & Baird resulting

from their dealings with them. Thus, while the loss fund agreement was a contract between but two parties, CIE and Glacier, it formed the nucleus of a structure of altered legal relationships among CIE, Glacier, Pritchard & Baird, and CIE's reinsurers, all of which were contemplated by the regulatory agencies involved and by the parties contributing to the loss fund agreement.

Glacier soon discovered that, from its standpoint, the loss fund agreement was a disaster. Losses were greater than Glacier had anticipated. As of January 28, 1977, Glacier had established a total of loss and expense reserves for the assumed risks in the amount of $17,116,692. As of that date it had actually paid in losses and expenses $12,956,770.88. Hayden estimated that the total cost of the assumed CIE malpractice book could approximate $24,000,000. This cannot be verified from the record.

The loss fund agreement provides:

It is warranted by the Company that the underwriting information supplied to the Administrator as an inducement to enter into this Agreement is essentially correct. Such underwriting information is attached hereto and incorporated by reference, being Exhibit II.

Later a specific warranty was given by Pritchard & Baird and CIE as follows:

Pritchard & Baird, Inc. hereby guarantees the performance of the warranties of Casualty Indemnity Exchange under subparagraphs A and B of Article V of the loss fund agreement between Casualty Indemnity Exchange and Glacier General Assurance Company.

Casualty Indemnity Exchange hereby guarantees the performance of the warranties of Casualty Indemnity Exchange under subparagraphs A and B of Article V of the loss fund agreement between Casualty Indemnity Exchange and Glacier General Assurance Company.[1] (Documents 19 and 20, Ex. E)

It is clear that the CIE loss reserves were deliberately understated on the CIE books, and, since the Pritchard & Baird proposals were based on the CIE books, in the Pritchard & Baird proposal as well. The understatement is found by the court to be in the amount of $3,251,219, which is the amount of the understatement determined by Atwood. This amount is less than the amount by which the reserves were arbitrarily reduced by CIE management early in 1974. CIE was purportedly establishing loss and expense reserves on a case-by-case basis and reserves so established are based on the judgment of the underwriters. Honest and experienced underwriters might differ in their appraisals, but when reserves established by the best judgment of employed underwriters are arbitrarily reduced, then the reserve figures cease to mean anything and become pure fiction. This arbitrary reduction of reserves, considered along with the back-dating of reserve charges and the late reporting of claims, leads to the conclusion that CIE was engaged in deceptive practices and was engaged in them with the intent to deceive. The purpose of the deception was to lead the public regulatory bodies, and everyone else who might be interested in the books of CIE, to believe that CIE was in better financial condition than it was. CIE continued to defend the loss reserves stated in its books through the California hearing of July 25, 1974.

In the after-light, the Begos Report was hopelessly wrong. The statement that CIE was overreserved and that claims could be settled for 50% of the reserves, when compared with the actual pay-outs on claims paid, appears reckless. The record warrants the inference that Begos was not hired to make an independent evaluation of the CIE files, but was hired to lend respectability to the Pritchard & Baird proposals and to ward off the threats of the California department to enter a cease-and-desist order. In any event, even if the Begos Report gave CIE some confidence in its

1. These specific warranties did not, in the opinion of the court, have the effect of revoking the warranty here discussed.

reserve estimates, it did not justify CIE in submitting its reserve figures for the consideration of others without a disclosure of the method by which those figures had been established. CIE was guilty of actual fraud.

■ Since a loss reserve fund is established by some method employing judgment, a statement of a loss reserve is in a sense the statement of an opinion, and normally statements of opinions do not constitute fraudulent representations. *Beierle v. Taylor*, 164 Mont. 436, 524 P.2d 783 (1974), but, in the insurance industry, if a person publishes for the use of the public its loss reserve figures, that person must be held to say no less than that those figures reflect a considered and honest judgment as to the liability which has been incurred to date. If the figures so published are determined arbitrarily and with the intent to deceive and are in fact false, then the publisher is guilty of fraud regardless of whether his expression be one of fact or one of opinion. *See Koch v. Rhodes*, 57 Mont. 447, 188 P. 933 (1920); *Como Orchard Land Co. v. Markham*, 54 Mont. 438, 171 P. 274 (1918).

■ There was a breach of an express warranty, and the damages caused by the breach are in the amount of $3,251,219.

The loss fund agreement contained a warranty that the underwriting information supplied to Glacier was essentially correct.

■ Exhibit II, containing the underwriting information, which should have been attached to the agreement, never was attached. It is obvious from the face of the contract that the parties intended that there be a warranty. The failure to attach Exhibit II made the terms of the warranty ambiguous, and parol evidence may be used to supply the missing terms. *See Tribble v. Reely*, Mont., 557 P.2d 813 (1976). Annot., 70 A.L.R. 752–53 (1931), n. 4.

■ No document was offered in evidence purporting to constitute the missing Exhibit II, nor is it clear that Exhibit II was ever compiled, but the uncontradicted testimony of Hayden was that the term "underwriting information" was intended to include the CIE 1973 annual statement and the figures shown in the Pritchard & Baird proposal. Contemporaneous work papers offered in evidence show that Hayden used as a basis for his calculations of the cash consideration Glacier would require the loss of reserves of CIE in the sum of $2,107,300 and the excess loss reserves in the sum of $6,293,470, for a total of $8,500,-770, as shown in a Pritchard & Baird proposal (Ex. 3B), and that Selle, the Glacier accountant, in making his calculations, used the CIE and the excess loss and expense reserves supplied in a slightly different version of the Pritchard & Baird proposal (Ex. 3). While the work papers of Hayden and Selle, undisclosed to CIE, could not supply meaning to an ambiguous term in the contract, they do support Hayden's testimony that the figures contained in the Pritchard & Baird proposals were underwriting information and were to be included in the missing Exhibit II. I find that CIE did warrant that the loss reserves as shown in the Pritchard & Baird proposal were essentially correct. The information as to the loss reserves was not essentially correct, and the warranty was breached.

■ The problems of a reliance, and a right to rely, on the representations do not appear when the action is grounded in warranty. The warranty is as much a part of the contract as any other part, and the right to damages on the breach depends on nothing more than the breach of warranty. The rule is stated in *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946), in this language:

> . . . A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

While *Metropolitan Coal Co. v. Howard, supra,* is an admiralty case, the rule stated is one of general application. *Paccon, Inc. v. United States,* 399 F.2d 162, 185 Ct.Cl. 24 (1968).

Damages are fixed at $3,251,219, which is the difference between the CIE reserves stated in the annual report for 1973 and what an honestly-determined reserve would have been. This is, as previously indicated, less than the amount ($4,000,000) which the books would have reflected had not the CIE underwriters' case-by-case determination of reserves been arbitrarily altered. The evidence does not show what the loss reserves were at the time the underwriting information was given in July 1974, and by reason of the claims reported after December 31, 1973, and claims and expenses paid after that date, the reserves would not have been established in July 1974 at exactly the December 1973 level. Hence it cannot be said that the understatement of reserves in the annual report was carried forward in exactly the same amount into the Pritchard & Baird proposals. There is no indication, however, that the reserves established for losses prior to 1973 were adjusted upwards, and there is no evidence of any change in CIE's reserving practices. The figures shown in the annual report for CIE's losses, incurred and reported, and losses, incurred but not reported, total $3,296,846, while the same losses in the Pritchard & Baird proposal are $3,307,300.

An examination of nine claims (admittedly extreme examples) filed between January 1, 1974, and July 31, 1974, shows that CIE loss reserves were established at $110,-550 while the actual payments made to settle the claims were $946,000. In eight of these claims nominal loss reserves were established and maintained at $50 per claimant, while the cost of settling them was $648,000. While not conclusive, this tends to indicate that the understatement of reserves was not diminished between January 1974 and July 1974.

■ Glacier's prayer for a rescission is denied.

The facts in this case require that the court, as a matter of policy, refrain from exercising its equitable power of rescission. The effect of the rescission on CIE, if it is, as Glacier states, insolvent, would be minimal because it has no funds with which to pay the losses. If the loss fund agreement were rescinded, then the reinsurance obligations undertaken in it would be discharged, the preexisting reinsurance would not be reinstated, and the burden of open claims would fall on the policyholders or claimants, or some state-created fund.

The matter was sufficiently affected with a public interest that the consent of the Missouri Division of Insurance, the California Department of Insurance, and the Commissioner of Insurance of Montana was required before Glacier could take the place of the many companies who had carried the reinsurance burden. The orders permitting the execution of the loss fund agreement were granted on the petition of Glacier. The whole purpose of the insurance commissioner hearings was to provide policyholder and claimant protection. During the course of the hearings Hayden assured the commissioners that he had sufficient knowledge to recognize that "this is a reasonable treaty to enter into."

Glacier entered into the loss fund agreement with information which should have warned it of the precarious nature of the venture it was undertaking. Glacier knew that the California Department of Insurance, following an audit based on Atwood's report, had determined the CIE loss reserves to be inadequate in the amount of $3,251,219 and that CIE was insolvent. It knew from the Von Gunten Report that CIE had arbitrarily juggled its loss reserves and back-dated them. It knew that the California Department of Insurance considered CIE to be in a hazardous condition. Glacier, as plaintiff in Cause No. CV 74–68–M, had charged Pritchard & Baird and CIE with fraud in connection with the placing of reinsurance and the reporting of losses to reinsurers.

The remedy of rescission is equitable in nature and normally is used to restore the parties to a previously-existing condition.

Apart from the fact that in this case it would be impossible to restore Glacier and CIE to their previously-existing condition, a court of equity cannot blind itself to the fact that third parties are involved. If Glacier is relieved of its obligations to reinsure, someone other than CIE or its reinsurers will bear the burden, and the governmental policy expressed by the commissioners' order approving the loss fund agreement will be frustrated. A party should not, at the time he enters into a contract with one person, which does alter the status of others, be permitted to contemplate a rescission as to the one' without regard to the consequences to the others. There is some indication that this was Glacier's thought.[2] A court of equity should not use the remedy of rescission to accomplish such a result.

**2.** The following colloquy appears in the transcript of the California hearing:

Q Mr. Hayden, certain representations have been made to you in connection with the negotiations of this treaty, I would assume?

A That's correct.

Q If any of these representations are not true and false representations have been made, would you consider the agreement would be vitiated?

A Well, I have currently pending a lawsuit filed against CIE and 11 other parties and part of this is I have agreed to withdraw that lawsuit if we can reach an agreement here, and I think without advice of counsel, I would say that, yes, we would withdraw that and in the event there had been misrepresentations possibly refile it.