SOUTHERN BROADCAST GROUP,
LLC, Plaintiff,

v.

GEM BROADCASTING, INC.,
and Joseph D. Farish, Jr.,
Defendants.

No. 6:00–cv–484–Orl–31JGG.

United States District Court,
M.D. Florida,
Orlando Division.

June 7, 2001.

**1318**

Asher Rabinowitz, FL, for Plaintiff.

Ronnie Hugh Walker, Orlando, FL, for Defendants.

## ORDER

PRESNELL, District Judge.

This cause comes before the Court on the following matters:

(1) Defendants' Motion for Summary Judgment (Doc. No. 79, filed March 14, 2001);

(2) Gem Broadcasting, Inc.'s and Joseph D. Farish Jr.'s Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. No. 80, filed March 14, 2001);

(3) Defendant's Motion for Summary Judgment on Gem Broadcasting, Inc.'s Counterclaim and Memorandum in Support (Doc. No. 83, filed March 20, 2001);

(4) Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 87, filed March 26, 2001);

(5) Plaintiff's Motion for Partial Summary Judgment (Doc. No. 88, filed March 26, 2001);

(6) Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. No. 89, filed March 26, 2001);

(7) Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment on the Counterclaim of Gem Broadcasting, Inc. (Doc. No. 98, filed March 29, 2001);

(8) Gem Broadcasting, Inc.'s and Joseph D. Farish Jr.'s Memorandum in Opposition to Southern Broadcast Group, LLC's Motion for Partial Summary Judgment (Doc. No. 101, filed April 6, 2001).

## I. BACKGROUND

On September 30, 1999, Southern Broadcast Group, LLC (Southern) and Gem Broadcasting, Inc. (Gem) entered into an Asset Purchase Agreement[1] (APA or Agreement) for the sale of two radio stations owned and operated by Gem. The two stations, WTSM and WAOA, broadcast from three antenna towers located in Brevard County, Florida. The purchase price for the two stations was $10,000,000.

Prior to the execution of the Agreement, Southern personnel met with Gem's President, Joseph Farish, to discuss the acquisition of the radio stations. Thereafter, on August 12, 1999, Gem and Southern executed a Letter of Understanding which included a due diligence period, giving Southern between August 12, 1999 and September 15, 1999 to undertake and complete its due diligence. During this peri-od, Southern performed financial projections, retained legal counsel to examine Gem records on file at the Federal Communications Commission, examined various contracts, and made certain inquiries and investigations. Southern also hired a radio engineer to inspect the towers. On September 14, 1999 Michael Oesterle, Manager and Chief Operating Officer of Southern, sent a letter to Gem stating that the due diligence examination results were satisfactory to Southern.

After Gem and Southern signed the Agreement, Media One Group–Florida, Ltd. (Media One) filed a lawsuit against Gem and Southern, contending that it had a valid contract to purchase the stations. The pendency of that lawsuit delayed the closing of the sale from Gem to Southern. The Media One lawsuit was resolved on February 22, 2000, and the parties scheduled a closing one month later. During the interim, Southern had negotiated with third parties to resell the stations, once it acquired ownership. Southern reached an agreement to sell the stations to Cumulus Broadcasting, Inc. (Cumulus) for $9,500,000 and the towers to SBA Communications Corp. (SBA) for $4,625,000. Prior to closing on the Agreement, neither Gem nor Farish had any knowledge of Southern's negotiations to resell the assets.

When SBA conducted its own due diligence, it discovered that two of the towers were structurally defective and that Parcel 4, on which Tower 3 stands, was landlocked. In addition, Southern learned that there was an annual tower revenue shortfall of approximately $60,000. When Southern informed Gem of these deficien-

---

1. The Asset Purchase Agreement between Southern and Gem, which is indexed in the record as Exhibit 1 to Volume I of Index of Exhibits to Southern's Motion for Partial Summary Judgment, will be cited to as follows: (APA § —— ).

cies, the closing date scheduled for March 22, 2000 was postponed until April 7, 2000 to allow the parties an opportunity to resolve these issues.

On March 30, 2000, Oesterle and Farish met to discuss the matter. Although Farish was unwilling to correct the deficiencies, he did offer to terminate the Agreement, refund Southern's $500,000 deposit and pay Southern $750,000. This proposal was not acceptable to Southern, and on March 31, 2000, Oesterle wrote Farish a letter stating that if certain actions were taken to resolve the title problem on Parcel 4, Southern would close the transaction. When countersigning the March 31 letter, Farish typed in, below his signature, this statement: "[T]he above conditions are totally immaterial and unessential to the closing of this transaction."

Despite its knowledge of the alleged deficiencies, Southern closed on the radio station assets on April 7, 2000. That same day, Southern sold the assets to Cumulus and SBA. However, since Southern had given SBA the same warranties respecting the towers which it had received from Gem, the Southern/SBA purchase price was reduced to $3,140,000, a reduction of $1,485,000.[2]

Shortly after the closing, Southern instituted this action against Gem for breach of contract, contending that Gem breached the seller's warranties and representations respecting the station assets. Southern also asserted a claim of fraudulent inducement against Gem and Farish, based on the alleged misrepresentations, as well as an indemnification claim against Gem for costs and attorneys' fees Southern incurred defending the Media One litigation.

Gem counterclaimed, alleging that Southern breached the Agreement by failing to remit accounts receivable which Southern had collected post-closing.

Southern now moves for partial summary judgment on its breach of contract claim. Gem and Farish also move for summary judgment on all of Southern's claims. Additionally, Gem moves for summary judgment on its counterclaim. On May 9, 2001, this Court heard oral argument on the motions.

## II. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of fact is genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the court's focus in ruling on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

---

**2.** This amount, plus the $25,000 which Southern allegedly spent to cure the title defect constitute Southern's damage claim for breach of contract.

party must prevail as a matter of law." *Id.* at 251, 106 S.Ct. 2505; *see also Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997).

### B. Southern's Breach of Contract Claim

In Count I of its Complaint, Southern claims that Gem breached its warranties and representations by failing to disclose structural defects in the radio towers, failing to disclose that Parcel 4 was landlocked, and by overstating revenues. No factual dispute exists regarding whether Gem actually breached the warranties in the Agreement concerning structural defects in the towers and overstatement of revenues.[3] Indeed, counsel for Gem tacitly conceded this point at the hearing on this matter, and the documentary evidence in the record clearly reflects that there was structural damage to the towers and a rent arrearage on the tower leases. Rather, Gem argues that Southern cannot establish reliance on the warranty as a necessary element to its breach of warranty claim or, alternatively, that Southern waived its right to sue for breach of warranty because it proceeded to close the deal with full knowledge of the deficiencies. Gem further argues that Southern cannot sue for breach of warranty because it failed to give notice of the breach as required by the parties' Agreement. The Court will address each issue in turn.

#### (1) Reliance as Element of Breach of Warranty Claim

■ Under Florida law, an express warranty arises where the seller asserts a fact of which the buyer is ignorant prior to the beginning of the transaction, and on which the buyer justifiably relies as part of the "basis of the bargain." *Hobco, Inc. v. Tallahassee Assoc.,* 807 F.2d 1529, 1533 (11th Cir.1987); *Thursby v. Reynolds Metals Co.,* 466 So.2d 245, 250 (Fla.Dist.Ct. App.1984). The Florida Supreme Court has not yet decided whether proof of reliance is required to recover for breach of an express written warranty.[4] A review of the law of other jurisdictions, however, reveals a split of authority on the issue.

The Eighth and Tenth Circuits, applying Minnesota and Kansas law respectively, have found that reliance is essential to a buyer's recovery under an express written warranty. *See Hendricks v. Callahan,* 972 F.2d 190 (8th Cir.1992); *Land v. Roper Corp.,* 531 F.2d 445 (10th Cir.1976). In contrast, a decisive majority of courts that have considered the issue have found that reliance is not an element in a claim for breach of warranty. *See, e.g., Wikoff v. Vanderveld,* 897 F.2d 232, 240–41 (7th Cir. 1990) (Illinois law); *Giuffrida v. American Family Brands, Inc.,* No. CIV. A. 96–7062, 1998 WL 196402, at *4 (E.D.Pa. Apr.23, 1998) (Pennsylvania law); *Pegasus Mgmt. Co., Inc. v. Lyssa, Inc.,* 995 F.Supp. 29, 39 (D.Mass.1998) (Connecticut law); *Glacier Gen. Assurance Co. v. Casualty Indem. Exch.,* 435 F.Supp. 855, 860–61 (D.Mont. 1977) (Montana law); *CBS Inc. v. Ziff–Davis Publ'g Co.,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997, 1000–01

---

3. Apparently, there is a factual dispute concerning whether Gem materially breached its warranty and representations with respect to Parcel 4. (*See* Gem's Mem. in Supp. of Mot. for Summ. J., Doc. No. 80 at 13; Oesterle Letter of 3/21/2000, Ex. O to Doc. No. 81). This issue will therefore be left for resolution by the jury at trial.

4. *See Lennar Homes, Inc. v. Masonite Corp.,* 32 F.Supp.2d 396 (E.D.La.1998) (where the district court, noting that Florida courts had not yet considered the question of reliance in the context of an express written warranty, predicted that the Florida Supreme Court would adopt the modern view and not require proof of reliance in a breach of warranty action).

(1990) (New York law); *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 817 P.2d 238, 246 (1991) (New Mexico law); *Essex Group, Inc. v. Nill*, 594 N.E.2d 503, 506–07 (Ind.Ct.App.1992) (Indiana law); *Wechsler v. Long Island Rehab. Ctr. of Nassau, Inc.*, No. CIV. A. 93–6946–B, 1996 WL 590679, at *22–23 (Mass.Super. Sept. 4, 1996) (Massachusetts law).

Perhaps the most influential case supporting the position that reliance is not necessary to a breach of warranty claim is the New York case of *CBS Inc. v. Ziff–Davis Publ'g Co. (Ziff–Davis )*. In that case, CBS and Ziff–Davis entered into a purchase agreement containing certain warranties, including a provision that all "representations and warranties . . . shall survive the closing, notwithstanding any investigation made by or on behalf of the other party." 554 N.Y.S.2d 449, 553 N.E.2d at 999. After entering into the purchase agreement but before closing, CBS uncovered information leading it to conclude that Ziff–Davis had misrepresented the financial condition of the businesses CBS sought to purchase. *Id.* When CBS informed Ziff–Davis of its concerns, Ziff–Davis responded that nothing was wrong and indicated its intention to hold CBS to the agreed upon closing date. *Id.* After the parties closed, CBS filed suit for breach of the warranties. *Id.* The lower court dismissed CBS's claims on the ground that CBS did not allege reliance on the warranty. *Id.* The appellate court affirmed and appeal was taken to the Court of Appeals of New York. *Id.* The issue before the court was whether a "buyer's manifested lack of belief in and reliance on the truth of the warranted information prior to the closing relieve[s] the seller of its obligations under the warranties?" *Id.* at 998. The Court of Appeals answered this question in the negative and reinstated

CBS's breach of warranty claim. *Id.* The court found that the critical inquiry was not whether CBS believed in the truth of the warranted information at the time of closing but whether CBS believed it was purchasing a promise as to its truth. *Id.* at 1000–01. According to the court,

> The express warranty is as much a part of the contract as any other term. Once the express warranty is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached.

*Id.* at 1001. Thus, the New York Court of Appeals held that a seller should not be absolved from its warranty obligations due to the buyer's lack of reliance because to do so "would have the effect of depriving the express warranties of their only value" to the buyer. *Id.* at 1002.

After *Ziff–Davis*, the United States Court of Appeals for the Second Circuit, again considering the reliance issue in the breach of warranty context, recognized that although reliance was not an element of a breach of warranty claim under New York law, the seller could raise lack of reliance in defense of such a claim. *Galli v. Metz*, 973 F.2d 145, 151 (2d Cir.1992). Considering the lack of reliance issue as a question of waiver, the court reasoned:

> Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless the buyer expressly preserves his rights un-

der the warranties (as CBS did in *Ziff-Davis* ), we think the buyer has waived the breach.

*Id.; see also Rogath v. Siebenmann,* 129 F.3d 261, 264 (2d Cir.1997); *Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.,* 10 F.Supp.2d 345, 361 (S.D.N.Y. 1998). The New York cases have made clear the courts' view that a buyer waives a claim for breach of warranty by closing in the face of a seller's disclosure of the breach.[5]

Following *Ziff-Davis,* other courts faced with the reliance/waiver conundrum have grounded their rulings in warranty survival clauses. For example, in *Pegasus Management Co., Inc. v. Lyssa, Inc.,* a district court applying the law of Connecticut held that the Connecticut Supreme Court would not require reliance with respect to plaintiff's breach of warranty claim where the language of the purchase agreement provided that the warranties set forth in the agreement would survive closing. 995 F.Supp. 29, 39 (D.Mass.1998). Similarly, in *Giuffrida v. American Family Brands, Inc.,* a district court applying Pennsylvania law held that plaintiff did not need to prove reliance to maintain its breach of warranty claims. 1998 WL 196402, at *4. The court opined that requiring proof of reliance in actions for breach of express warranty would be "inconsistent with the commercial realities of these complex purchase agreements negotiated over several months by sophisticated parties" and

would "permit[ ] sellers to escape liability for negotiated representations and warranties . . . ." *Id.* Despite this apparent expression of support for the no-reliance position, however, the court declined to address whether the Pennsylvania Supreme Court would adopt the reasoning of the New York cases. *Id.* at *5. Rather, like the court in *Pegasus,* the *Giuffrida* court concluded that because the parties' purchase agreement included a provision stating that all representations and warranties would endure for two years past the closing date, the plaintiff was not required to prove reliance to prevail on the breach of warranty claim. *Id.*

Recently, in the case of *Lennar Homes, Inc. v. Masonite Corp.,* a district court applying Florida substantive law to a breach of warranty claim, grappled with how Florida courts would resolve the reliance question. 32 F.Supp.2d 396, 398–400 (E.D.La.1998). Concluding that Florida courts would not require a plaintiff to show reliance in a breach of express warranty action, the court reasoned that "[a]lthough tort-contract distinctions are at times doctrinally elusive," courts should not interject the tort principle of reliance into warranty claims because to do so would "dissolve Florida's distinction between the tort of misrepresentation and breach of contract." *Id.* at 399.

■ As is clear from this brief summary of cases, the law in this area is far from

---

5. Interestingly, the same courts have found no waiver when the buyer's knowledge concerning the breach of warranty came from a source other than the seller. *See, e.g., Rogath,* 129 F.3d at 265. In this Court's view, this distinction makes sense only if the buyer learned of facts constituting a breach independently or from third parties prior to the execution of the contract. Under those circumstances, "it is not unrealistic to assume

that the buyer purchased the seller's warranty 'as insurance against any future claims,' and that is why he insisted on the inclusion of the warranties in the bill of sale." *Id.* (quoting *Galli v. Metz,* 973 F.2d at 151). However, if the buyer learned of the breach after execution of the contract but before closing, the source of the buyer's knowledge should be immaterial to the court's analysis of the waiver issue.

settled.[6] Confusion abounds, in part, because of the historical tort nature of a warranty claim but also because of confusion concerning the timing of the reliance at issue. The reliance required, if any, to support a breach of warranty claim is reliance on the warranty at the time the contract is formed, not later at some time prior to closing the deal. *See Hobco Inc. v. Tallahassee Assoc.*, 807 F.2d at 1533 ("Under Florida law, an express warranty may arise only where justifiable reliance upon assertions or affirmations *is part of the basis of the bargain*."); *Thursby v. Reynolds Metals Co.*, 466 So.2d at 250 (holding that express warranty arises only "where the seller asserts facts of which buyer is ignorant *prior to the beginning of the transaction* " and on which the buyer justifiably relies) (emphasis added). Accordingly, like my sister court in Louisiana, this Court concludes that the Florida Supreme Court would embrace the modern view that express warranties are bargained-for terms of a contractual agreement, any breach of which is actionable notwithstanding proof of non-reliance at the time of closing on the contract.

 In the instant case, the record evidence reveals that Southern relied on the warranties and representations made by Gem in deciding to purchase the radio station assets for $10,000,000. As part of the consideration for Southern's promise to pay that sum, Southern received an express warranty from Gem regarding the structural and financial condition of its assets. When Gem breached that warranty, Southern did not get what it bargained for. The fact that Southern discovered the breach after entering into the Agreement but prior to closing does not change the analysis. Otherwise, a seller could breach its warranties with impunity by simply disclosing its breach prior to closing and thus deny the buyer the benefit of its bargain.

### (2) Waiver

 As an alternative to its argument that Southern did not rely on the warranties contained in the APA, Gem argues that Southern waived its right to bring a breach of warranty claim. Under Florida law, a party may waive a right to pursue a claim, despite the existence of a written contract, by intentionally relinquishing that right through subsequent words or conduct. *Gilman v. Butzloff*, 155 Fla. 888, 22 So.2d 263, 265 (1945). The acts, conduct, or circumstances relied upon to show a waiver must make out a clear case. *Id.* Turning to the parties' Agreement, the Court finds that Sections 17.1 and 20.2 of the APA bear directly on the waiver issue. Section 17.1 of the APA states that "[a]ll representations, warranties, and covenants made by the parties in this Agreement . . . shall survive the Closing and remain operative and in full force for one (1) year." (APA § 17.1). The Agreement also contains a non-waiver clause which provides that "[n]o provision, condition or covenant of this Agreement shall be waived by either party hereto except by a written instrument delivered to the other party and signed by the party consenting to and to be charged with such waiver." (APA § 20.2).

Far from making out a clear case of waiver, these provisions suggest that Southern preserved its breach of warranty claim by the terms of the Agreement. *See*

---

6. For a thorough discussion of this topic, see Matthew J. Duchemin, Comment, *Whether Reliance on the Warranty is Required in a Common Law Action for Breach of an Express Warranty?*, Marq. L.Rev. (1999).

*Giuffrida*, 1998 WL 196402, at *5 (where the court held that warranty survival clause and non-waiver provision in purchase agreement unambiguously preserved the buyer's right to bring a claim for breach of warranty). Moreover, even under the New York approach to breach of warranty claims, which allows sellers to avoid liability by showing that the buyer proceeded to closing with full knowledge of the seller's breach, the record does not clearly support a finding of waiver. As *Ziff–Davis* and its progeny demonstrate, an otherwise viable waiver defense will be defeated where the buyer expressly preserved his right to enforce the agreement. *See, e.g., Rogath*, 129 F.3d at 264–265. As stated above, on the face of the APA, it appears that Southern preserved its right to enforce Gem's warranties and representations through the warranty survival clause and non-waiver provision. Accordingly, the Court is unable to conclude, as a matter of law, that Southern waived its right to sue Gem for breach of warranty.

### (3) Notice

 Gem further contends that Southern is not entitled to partial summary judgment because Southern cannot establish all of the elements essential to its contract claim, namely compliance with the Agreement's notice requirements. Under Florida law, when a written contract requires notice as a condition precedent to maintaining suit, that condition must be met absent a valid excuse. *Eglin Village v. Barnett Nat'l Bank*, 86 So.2d 271, 272 (Fla.1956). The controlling Agreement in this case contains two different notice provisions. Section 12 of the Agreement, captioned "Indemnifications," discusses the indemnification of claims in the event that either the buyer or seller materially breaches any of the representations or warranties contained in the Agreement. Section 12.1 provides:

> *Breach of Seller's Agreements, Representations, and Warranties.* Seller shall reimburse Buyer for, indemnify and hold harmless Buyer from and against any loss, damage, liability, obligation, deficiency, claim, suit, cause of action, demand, judgment, or expense (including without limitation, payments, fines, penalties, interest, taxes, assessments, and reasonable attorney's fees and accounting fees), contingent or otherwise, whether incurred or asserted prior to or after the Closing Date, arising out of or sustained by Buyer by reason of:

> (a) any material breach of warranty, representation, or agreement of Seller contained under this Agreement or in any certificate or other instrument furnished to Buyer pursuant to this Agreement or in connection with any of the Transactions contemplated hereby

. . . . .

(APA § 12.1). Section 12 also provides that a party seeking indemnification under this section must first provide notice of the claim:

> *Notice of Claim.* Buyer and Seller agree to give prompt written notice to each other of any claim for indemnification under Section 12.1 or 12.2 hereof ("Notice of Claim") which amount is believed to be required to discharge the obligations of the indemnifying party resulting therefrom . . . .

(APA § 12.3).

Southern claims that the notice provision of Section 12 applies only to third-party claims and not to direct claims asserted by the Buyer against the Seller for breach of warranty. In support of this

proposition, Southern directs the Court to the case of *U.S.B. Acquisition Co., Inc. v. Stamm*, 660 So.2d 1075 (Fla.Dist.Ct.App. 1995). In that case, the buyer of a concrete manufacturing business sued the sellers for damages alleging breach of contract and various tort theories. *Id.* at 1077. Following a trial, the jury found that the sellers had breached the asset purchase agreement and awarded the buyer damages, including damages for the buyer's operating losses. *Id.* at 1078. After the trial, the court granted the seller's post-trial motion for directed verdict on the issue of the buyer's operating losses and deleted that portion of the damage award. *Id.*

On appeal, the buyer argued that it was entitled to recoup its operating losses according to the agreement's indemnification provision. *Id.* at 1079. The indemnification provision required the sellers "to indemnify and hold harmless buyer against and in respect of any and all damages, deficiencies, losses or liabilities resulting from any misrepresentation, breach of warranty or non-fulfillment of any covenant or agreement on the part of the sellers." *Id.* In rejecting the buyer's argument, the court held:

> We think it clear that the indemnification paragraph, considered in its entirety, and particularly with respect to the clause requiring that the buyer notify the sellers of any claim of the commencement of any action and the opportunity to compromise, settle or defend the same, was properly construed by the trial court as intending indemnification against claims of or liability to third parties and was not intended by the parties to extend to indemnification against the buyer's operating losses subsequent to the purchase.

*Id.* The court further noted that, although contractual indemnity provisions are not necessarily limited to third-party claims, the intent of the parties must be determined from the language employed in the contract. *Id.* at 1079 n. 2. In the instant case, the Court agrees with Southern that the similar notice provision of Section 12.3 only applies to third-party claims.

■ Having concluded that the notice provisions of Section 12 are applicable only to third-party claims and not to direct claims against the seller for breach of warranty, the Court next considers the notice provision found in Section 16 of the Agreement. Section 16, entitled "Default and Termination," provides for certain pre-closing remedies, *i.e.*, termination with return of the buyer's deposit or specific performance. These remedies, however, are not exclusive. Section 16.2 of the APA provides:

> If either party believes the other to be in default hereunder, the former party shall provide the other with written notice specifying in reasonable detail the nature of such default. If the default is not curable or has not been cured within ten (10) days after delivery of the notice (or such additional reasonable time as the circumstances may warrant provided the party in default undertakes diligent, good faith efforts to cure the default within such ten (10) day period and continues such efforts thereafter), then the party giving such notice *may* terminate this Agreement *and/or* exercise the remedies available to such party to this agreement, subject to the right of the other party to contest such action through appropriate proceedings.

(APA § 16.2) (emphasis added). In addition to seeking specific performance or termination under Section 16.4 of the

Agreement, the buyer has a post-closing remedy to sue for direct indemnification under Section 12 for seller's breach of warranty.

Since neither pre-closing remedy (termination or specific performance) would allow Southern to enforce the benefit of its bargain, Southern chose to close and then sue Gem for breach of warranty. Nothing in the parties' Agreement precludes Southern from suing for breach after closing. However, Section 16 does require that Southern give Gem "written notice specifying in reasonable detail the nature of such default." (APA § 16.2). There is no question but that Southern believed Gem to be in default prior to closing. Thus, the question becomes, did Southern provide notice in compliance with the contract and, if not, was such requirement excused or otherwise inapplicable?

According to Gem, "there is no factual dispute that Southern undertook and completed its due diligence inquiry, and that Michael Oesterle at no time communicated to Gem any notice of any alleged breach or default; nor is there any dispute that Section 16.2 of the September 30, 1999 Buy–Sell Agreement obligated Southern to provide Gem written notice of any alleged default." (Gem's Mem. in Supp. of Mot. for Summ. J, Doc. No. 80 at 5). Gem further states that "the record is absolutely vacant of even the most rudimentary written notice to Gem that they were in default." (Gem's Mem. in Opp. to Southern's Mot. for Partial Summ. J., Doc. No. 101 at 7). Southern, on the other hand, claims that Gem knew about the material breaches to the terms of the agreement and "covered its tracks," leaving Southern to discover the breaches on its own, and characterizes Gem's conduct as "active concealment." (Southern's Mem. in Supp.

of Mot. for Partial Summ. J., Doc. No. 89 at 14). Southern further argues that "any written notification Southern might have given to Gem would have been an utterly useless act." (*Id.*) Southern goes on to state that "[t]he instances in which Farish, on behalf of Gem, rejected the validity of any of Southern's claims are legion" and that Gem's conduct is "unrebutted in the record." (*Id.* at 15–16). Tellingly, in making these assertions, Southern fails to cite to evidence in the record which conclusively demonstrates that Gem was repeatedly notified of the problems and refused to take corrective action.

In its memorandum of law in support of motion for partial summary judgment, Southern addresses the notice issue. The Court duplicates the relevant section here, in its entirety:

> *G. Gem Received and Rejected Every Notice of Claim Sent by Southern.*
>
> On March 13, 2000, Southern notified Gem that there was no legal access to Parcel 4. Gem rejected this claim, and has never admitted that Parcel 4 was legally landlocked. On March 22, 2000, Southern made an identical claim, which was rejected by Gem. Southern was forced to remedy this defect. On March 22, 2000, Gem received a copy of the Chi Lee Report on Tower 2 from Southern's Washington, D.C. attorney, Richard A. Helmick. The report unequivocally stated that Tower 2 was structurally inadequate. Gem again rejected this claim. By the time Southern learned of the $60,000 annual shortfall in tower revenues, the closing was about to take place. Gem's representatives had actual notice of Southern's claims during this period, because they knew all about this shortfall, and only admitted misrepresentations to Southern on the eve of closing.

(*Id.* at 18). Again, it is notable that Southern fails to cite to evidence in the record that supports Southern's claim that Gem repeatedly rejected its alleged notice of claims. Upon the Court's independent examination of the voluminous exhibits appended to Southern's motion, the Court did locate several documents which shed light on this matter. For example, on March 13, 2000, Southern did indeed inform Farish that Parcel 4 was landlocked but did not indicate that Gem was in breach of the agreement or demand that Gem take corrective action. The letter states, in pertinent part,

> As you can see, Item 8 of Schedule B–II, indicates there is no access to Parcel 4. We have ordered a survey that we should receive sometime this week and if the survey indicates access to Parcel 4 is gained by way of one of the other parcels Southern is acquiring, we have no problem. However, if the survey reveals that Parcel 4 has no access we will get back in touch with you. . . .

(Oesterle Letter of 3/13/2000, Vol. III, Ex. 31 to Southern's Mot. for Partial Summ. J.). While this letter may well have put Gem on notice of the *potential* for a problem concerning Gem's compliance with the terms of the Agreement, it does not conclusively demonstrate that Southern made a notice of claim pursuant to Section 16 of the APA. Similarly, the record reflects that Southern faxed a copy of an engineering report to Gem which concluded that Tower 2 was structurally inadequate, (*see* Helmick Fax, Vol. III, Ex. 33 to Southern's Mot. for Partial Summ. J.); however, the Court finds no evidence that Southern conveyed to Gem that it considered the structural defects to the tower to constitute a material breach of the parties' Agreement that must be cured.

The only evidence in the record of Gem's refusal to respond to Southern's concerns about the structural and financial condition of the radio station assets is the Declaration of Michael Oesterle, Southern's Manager and Chief Operating Officer who orchestrated the transaction between Gem and Southern. The Oesterle Declaration outlines the various problems that Southern discovered with respect to the title defect, the structural defects to the towers, and the overstatement of tower revenues. (Oesterle Decl. at 1.54–1.61, Vol. II, Ex. 5 to Southern's Mot. for Partial Summ. J.). According to Oesterle, he confronted Farish with these "serious matters" at a meeting on March 22, 2000 but "Farish emphatically rejected each and every claim made by Southern as 'immaterial.'" (*Id.* at 1.62). As one might expect, Farish's account of the March 22, 2000 meeting tells a different story. According to Farish,

> On March 22, 2000, a closing had been agreed upon to be held in my office in West Palm Beach, and only Southern's trial counsel showed up making threats about litigation with no basis whatsoever. There had been no notification that the closing would not take place, and same came as a surprise . . . [S]ubsequently, after the demanding to close, in my office on March 31, 2000, Oesterele agreed that all matters had now been resolved, and that a closing would take place on April 7, 2000 at my office, and all conditions precedent had been agreed upon, and that he was fully satisfied with all representations and all documents that I had furnished to him regarding leases, cash flow and all related matters, and that he was satisfied and would close on said date in accordance with the terms of the Buy–Sell Agreement . . . At that time, Oesterle made no objections to any of the conditions of the

towers and/or other assets, and financial information.

(Farish Decl. at ¶¶ 15–17, Vol. III, Ex. 45 to Southern's Mot. for Partial Summ. J.). Farish further claims that had he been notified that Southern considered Gem to be in breach of the agreement, such notice "would not have been futile" since Farish did not wish to be subjected to the instant lawsuit. (Farish Decl. at ¶ 11, Ex. 1 to Doc. No. 101, Gem's Mem. in Opp. to Southern's Mot. for Partial Summ. J.). Additionally, Farish claims that, based on his ongoing discussions with Oesterle and based on the letter of March 31, 2000 in which Oesterele indicated his willingness to close the deal, it was his understanding that all outstanding issues had been re-solved. (*Id.* at ¶¶ 13–16). In further sup-port of his contention that Southern never notified Gem of a material breach or gave Gem sufficient opportunity to cure, Farish notes that he was never approached by Southern and asked to reduce the $10,000,000 sale price to reflect the struc-tural and financial deficiencies of the as-sets. (*Id.* at ¶ 17).

As the Court's discussion above makes clear, the facts are very much in dispute concerning the notice issue. Thus, sum-mary resolution of the issue is inappropri-ate. Consequently, because there are dis-puted issues of material fact on the waiver and notice issues, the Court concludes that neither party is entitled to summary judg-ment on Southern's breach of contract claim.

*C. Southern's Fraudulent Inducement Claim*

■ In Count II of its Complaint, Southern claims that Gem and Farish fraudulently induced Southern to enter into and close the Southern/Gem Agree-ment. Gem and Farish move for summary judgment on this claim on the ground that Southern cannot establish the essential el-ements of fraudulent inducement. Addi-tionally, Defendants argue that the claim is barred by the economic loss rule because Southern's allegations of fraud mirror those found in Southern's breach of con-tract claim.

■ To prevail on a cause of action for fraudulent inducement under Florida law, a plaintiff must show (1) a misrepresenta-tion of a material fact by the defendant; (2) that the defendant knew or should have known of the statement's falsity; (3) that the defendant intended that the represen-tation would induce plaintiff to rely and act upon it; and (4) that the plaintiff suffered injury in justifiable reliance on the repre-sentation. *Hillcrest Pac. Corp. v. Yama-mura*, 727 So.2d 1053, 1055 (Fla.Dist.Ct. App.1999). All parties cite to the case of *Johnson v. Davis*, 480 So.2d 625 (Fla.1985) in support of their respective positions. In *Johnson*, the Florida Supreme Court held:

> The doctrine of caveat emptor does not exempt a seller from the statements and representations which he makes to in-duce the buyer to act ... [furthermore] "a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, *unless he knows the representation to be false or its falsi-ty is obvious to him.*"

*Id.* at 627–28 (quoting *Besett v. Basnett*, 389 So.2d 995, 998 (Fla.1980)) (emphasis added).

Southern expends substantial room in its memorandum arguing that a plaintiff's fail-ure to investigate a defendant's represen-tations does not bar an action for fraud in the inducement. While this is a correct

statement of the law, Southern fails to recognize that this principle is inapposite to the facts of the instant case. This is not a case in which the plaintiff failed to investigate the defendant's representations. To the contrary, the record shows that Southern conducted a thorough due diligence investigation into the warranties and representations made by Gem in the APA. The record further shows that through Southern's own efforts, as well as the efforts of SBA, Southern discovered the alleged title defect of Parcel 4, the structural defects to the towers, and the shortfall in tower lease revenues prior to the closing and final execution of the Agreement. In the face of these apparent misrepresentations, and with full awareness of its rights and remedies under the Agreement, Southern chose to proceed to closing and sue for breach of warranty. It did so strategically, in order to realize its plan to sell the radio station assets to third parties for a profit while retaining the right to sue Gem for breach of warranty and recoup any damages sustained as a result of the misrepresentations.

The fact that Southern learned the full extent of the falsity of the alleged misrepresentations before closing is uncontested. Under these circumstances, even when the evidence is viewed in a light most favorable to Southern, no reasonable jury could find that Southern closed on the final purchase of the radio station assets in justifiable reliance on Gem's warranties and representations. Therefore, Gem and Farish are entitled to summary judgment on Southern's fraudulent inducement claim.

This Court's finding that Southern has failed to establish that it justifiably relied on Gem's warranties and representations makes it unnecessary for the Court to delve into the nebulous arena of the economic loss rule's impact on fraudulent inducement claims.[7] Accordingly, the Court will refrain from offering its predictions concerning how Florida courts would rule on that issue.

## D. Southern's Indemnity Claim

 In Count III of its Complaint, Southern brings a claim of indemnification against Gem for attorneys' fees and costs incurred in defense of the Media One litigation. Gem moves for summary judgment on the claim. According to Gem, the fact that Southern signed a stipulation in the Media One case which provided that each party would bear its own legal fees and costs is dispositive of this issue. The Court is unpersuaded by this argument, however, since only a strained reading of the stipulation could lead to such a conclusion. Rather, a common sense reading of the stipulation leads one to conclude that the stipulation formalizes an agreement reached by the opposing parties and was not intended to be a contract between co-defendants. Furthermore, even if the stipulation were interpreted in such a manner, there is no evidence in the record of consideration for such a contract. Therefore, Gem's argument on this point is without merit.

 Gem further argues that it is entitled to summary judgment on Southern's indemnification claim because of Southern's failure to comply with the APA's notice requirements. As discussed, *supra,*

---

**7.** For one of the more recent scholarly commentaries on the economic loss rule, see Paul J. Schwiep, *Fraudulent Inducement Claims Should Always Be Immune From Economic Loss Rule Attack,* 75 Fla. B.J. 22, 23 (April 2001), where the author recognizes that it has been "virtually impossible" for Florida courts to clearly define when the economic loss rule will defeat claims for fraudulent inducement of contract.

there are genuine issues of material fact concerning the notice issue which preclude the entry of summary judgment. Accordingly, because Gem does not provide the Court with any other basis on which to summarily dispose of Southern's indemnification claim, Gem's motion for summary judgment on this claim must be denied.

### E. Gem's Counterclaim for Breach of Contract

■ Gem also moves for summary judgment on its Counterclaim against Southern for breach of contract. According to Gem, Southern breached Section 18 of the APA, which imposes a duty on Southern to tender account receivables to Gem. Southern does not dispute the material facts set forth in Gem's Counterclaim. Rather, Southern argues that (1) Southern should be permitted to prove its claims and assert the defense of recoupment since the amount of Southern's claims far exceeds the total funds sought by Gem's Counterclaim; (2) the Court should not render final judgment on Gem's Counterclaim, even if the Court finds for Gem, until the conclusion of this litigation to avoid piece meal appeals; and (3) Southern should be permitted to deposit the funds at issue into the Registry of the Court to stop the accrual of interest on the funds.

The Court has addressed issues (1) and (3) in a previous Order[8] in which the Court denied Southern's request to deposit the accounts receivable funds owed to Gem into the Registry of the Court. In this Court's view, to allow Southern to deposit Gem's funds into the Registry of the Court would defeat the anti-offset provision found in Section 18 of the APA. Section 18, which requires Southern to collect account receivables and remit the proceeds to Gem, provides:

> Notwithstanding anything contained in this Agreement to the contrary, *Buyer shall have no right to offset any or all amounts collected or collectible from the Accounts Receivable against any claims,* charges, expenses, fees or other payments · of any kind of (sic) nature whatsoever under any circumstances, including, but not limited to, any liability which may arise due to any breach or alleged breach of this Agreement or any provision hereof.

(APA § 18) (emphasis added).

■ The unambiguous language of Section 18 precludes any attempt by Southern to offset the monies owed to Gem from the accounts receivable against the monies allegedly owed to Southern from its breach of contract and indemnification claims.[9] Accordingly, there being no disputed issue of material fact as to this issue, Gem is entitled to summary judgment on its Counterclaim.

---

8. *See* Order, Doc. No. 51, entered September 26, 2000.

9. In its memorandum, Southern asks the Court to revisit its earlier ruling, arguing that because Florida law distinguishes between recoupment and set-offs, Southern's defense of recoupment is not precluded by Section 18. In making this argument, Southern erroneously refers to Section 18 as an "anti-set-off" provision. (Southern's Resp. in Opp. to Gem's Mot. for Summ. J. on Countercl., Doc. No. 98 at 2) when Section 18 is, in fact, an "anti-offset" provision. Recoupments and

set-offs are legal mechanisms to *offset,* displace, or deduct one's liability against that of the opposing party. A "set-off" is a legal term of art which refers to a counterclaim demand, arising out of a transaction extrinsic to plaintiff's cause of action. A recoupment, on the other hand, is a claim arising out of the same transaction between the same parties. *See, e.g., Cherney v. Moody,* 413 So.2d 866, 868 (Fla.Dist.Ct.App.1982). Semantic hairsplitting aside, Section 18 of the APA clearly waived any right Southern may have had to assert the defense of recoupment and

## III. CONCLUSION

Based on the foregoing discussion and upon careful consideration of the record, arguments of counsel, and all relevant law, the Court rules as follows:

It is **ORDERED** and **ADJUDGED** that

(1) Plaintiff's Motion for Partial Summary Judgment (Doc. No. 88) is **DENIED;**

(2) Defendants' Motion for Summary Judgment on Plaintiff's Claims (Doc. No. 79) is **DENIED;**

(3) Defendant's Motion for Summary Judgment on Gem Broadcasting, Inc's Counterclaim (Doc. No. 83) is **GRANTED.**

withhold the account receivables as payment for Southern's claims.